J-S15016-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.I., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2509 EDA 2021 |

Appeal from the Order Entered November 9, 2021
In the Court of Common Pleas of Philadelphia County
Juvenile Division at CP-51-DP-0001591-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: A.Y.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.I., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2510 EDA 2021 |

Appeal from the Decree Entered November 9, 2021
In the Court of Common Pleas of Philadelphia County
Juvenile Division at CP-51-AP-0000364-2021

BEFORE:  NICHOLS, J., MURRAY, J., and SULLIVAN, J.

MEMORANDUM BY MURRAY, J.:                    **FILED JUNE 13, 2022**

Appellant, K.I. (Father), appeals from the decree terminating his parental rights to his daughter (A.M. a/k/a A.Y.M.), and the order changing A.M.'s permanency goal to adoption.  Upon review, we affirm.

A.M. was born in October 2019.  When A.M. was two days old and still at Temple University Hospital, the hospital requested Philadelphia Department of Human Services (DHS) authorize A.M.'s discharge with her mother, S.M.

(Mother), who had been involved with DHS since 2011.[1]  Trial Court Opinion, 2/24/22, at 1.  A DHS social worker met Father at the hospital.  Father indicated he could not care for A.M.  In addition,

> Father did not name a possible resource for [A.M.] and did not reveal his address to DHS.  When asked for his address, Father told DHS to ask Mother for his address.  Mother stated she did not know Father's address.

*Id.* at 2.  The social worker gave Father her contact information.  *Id.* at 6.

DHS declined to authorize A.M.'s discharge with Mother, and obtained an order of protective custody on October 8, 2019.  After a hearing on October 18, 2019, the court adjudicated A.M. dependent.  As Father was not present at the dependency hearing, the court ordered him to "avail himself of DHS," and referred him to the Achieving Reunification Center (ARC) for parenting, housing and employment services.  *See id.* at 2-3.  The court further ordered that Father be permitted supervised visitation with A.M.  *Id.*  However, Father's whereabouts were unknown, and Father failed to appear at subsequent family service plan (FSP) meetings and permanency review hearings.  Consequently, the court repeatedly found Father had failed to comply with his parenting objectives.

DHS located Father on or about February 5, 2021, and Father attended the permanency review hearing held on March 25, 2021.  *Id.* at 4.  The court found Father to be "minimally compliant," and ordered him to maintain contact

---

[1] Mother did not have custody of her six older children.  *See* Trial Court Opinion, 2/24/22, at 2.

- 2 -

with DHS, provide proof of employment, obtain appropriate housing, attend a parenting program, and complete a behavioral health evaluation. ***Id.***

On July 8, 2021, DHS filed a petition to involuntarily terminate Father's parental rights and change A.M.'s permanency goal to adoption. The court held hearings on August 13, November 3, and November 9, 2021. On November 9, 2021, the court entered the decree involuntarily terminating Father's parental rights, and the order changing A.M.'s permanency goal to adoption.[2]

Father filed a timely notice of appeal and concise statement pursuant to Pa.R.A.P. 1925(a)(2)(i). Father presents five issues for review:

1. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Father, K.I., pursuant to 23 Pa.C.S.A. sections 2511(a)(1) where Father presented evidence that he tried to perform his parental duties.

2. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Father, K.I., pursuant to 23 Pa.C.S.A. sections 2511(a)(2) where Father presented evidence that he has remedied his situation by maintaining employment and taking parenting classes, housing classes and financial planning classes and has the present capacity to care for his child.

3. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Father, K.I,. pursuant to 23 Pa.C.S.A. sections 2511(a)(5) where evidence was provided to establish that [A.M. was] removed from the care of the Mother and Father is now capable of caring for his child.

---

[2] The court also terminated the parental rights of Mother, who has appealed the termination and goal change at 2578 EDA 2021 and 2579 EDA 2021.

4. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Father, K.I., pursuant to 23 Pa.C.S.A. sections 2511(a)(8) where evidence was presented to show that Father is now capable of caring for his child after he completed parenting, housing and financial planning classes, and maintained employment.

5. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Father, K.I., pursuant to 23 Pa.C.S.A. sections 2511(b) where evidence was presented that established the child had a close bond with her Father.

Father's Brief at 7.

In reviewing the termination of parental rights,

our standard of review requires [us to] accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As [the Supreme Court] discussed in *In re: R.J.T.*, [9 A.3d 1179, 1190 (Pa. 2010)], there are clear reasons for applying an abuse of discretion standard of review in these cases. [U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

***In re Adoption of S.P.***, 47 A.3d 817, 826-27 (Pa. 2012) (some citations omitted).

Here, DHS, as petitioner, had the burden to prove by clear and convincing evidence that its asserted grounds for termination were valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009). "[T]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***Id.*** (citation omitted).

Father's first four issues correspond to the trial court's finding that termination was warranted under 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8). Father argues his "substantial compliance with the FSP objectives/goals has provided clear and convincing evidence that the court improperly granted the termination of parental rights[.]" Father's Brief at 14.

A.M.'s counsel and DHS argue otherwise. ***See*** Participant's Brief at 35 (stating court "properly terminated Father's parental rights to A.M., because Father failed to perform his parental duties and refused or failed to remedy the conditions that caused A.M. to be in DHS's care."); ***see also*** DHS Brief at 10 (stating "Father failed to perform his parental duties . . . specifically by being absent from [A.M.'s] first fifteen months of life and being a mere visitation resource for the next ten months. In his post abandonment contact, Father failed to demonstrate a serious intent to resume a parental role[.]").

- 5 -

We need only agree with the trial court "as to any one subsection in order to affirm the termination of parental rights." *In re A.S.*, 11 A.3d 473, 478 (Pa. Super. 2010) (citation omitted). We highlight the second subsection, which provides for termination when

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

Subsection (a)(2) "emphasizes the child's present and future need for 'essential parental care, control or subsistence necessary for his physical or mental well-being.'" *In re E.A.P.*, 944 A.2d 79, 82 (Pa. Super. 2008) (citations omitted). Grounds for termination under subsection (a)(2) are not limited to affirmative misconduct. *Id.* "Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his [parental] rights may be forfeited." *Id.* at 83 (citation omitted).

The trial court meticulously detailed its reasoning as to each of the four grounds supporting termination. *See* Trial Court Opinion, 2/24/22, at 5-29. The court observed that A.M. had been in "continuous DHS care" her entire life. *Id.* at 11. Father was aware of Mother's pregnancy and was present at the hospital shortly after A.M.'s birth. *Id.* at 12. Nonetheless, Father "has shown a passive interest in fulfilling his parental duties." *Id.* at 20; *see also id.* at 9 ("Father had his first visit with [A.M.] since her birth … in January

2021, after approximately fifteen months."). Father "did not become consistent in his visitation until **after** TPR and goal change petitions were filed in early July 2021." *Id.* at 10 (emphasis added).

The trial court expressly found "the testimony of DHS Social Workers was credible. Father was not credible." *Id.* Citing extensively to the hearing testimony and case law, the court concluded Father "has not made an effort to put himself in a position for safe reunification. Father still does not have adequate housing for reunification." *Id.* Likewise, Father did "not utilize all available [DHS] resources," or make "a genuine effort to maintain communication and association" with A.M. *Id.* As the trial court has provided a comprehensive and well-reasoned analysis, *see id.* at 11-20, we adopt it in affirming termination of Father's parental rights under Section 2511(a).

As to Section 2511(b), the court must "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). When the trial court considers a child's needs and welfare, the "extent of any bond analysis . . . necessarily depends on the circumstances of the particular case." *In re K.Z.S.,* 946 A.2d 753, 763 (Pa. 2008).

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re A.S.*, 11 A.3d at 483 (citations omitted).

In his fifth issue, Father argues termination is contrary to A.M.'s bests interests because A.M. "has a loving bond" with him. Father's Brief at 20-21. Conversely, A.M.'s counsel argues:

> Father failed to establish and maintain a parental relationship with A.M. At the same time, A.M. developed a parental bond with her foster mother, who met all of A.M.'s physical, medical, developmental, and emotional needs. Thus, the Trial Court rightly concluded that A.M.'s needs and welfare were best served by terminating Father's parental rights and changing A.M.'s goal to adoption.

Participant's Brief at 35-36. DHS argues, "Testimony showed that the needs and welfare of [A.M.] would be served by terminating Father's parental rights." DHS Brief at 10. DHS states that A.M. "formed healthy attachments with her foster family while placed [and] would not be irreparably harmed by terminating Father's rights." *Id.*

As with Section 2511(a), the trial court thoroughly articulated its factual findings and cited prevailing legal authority in concluding that termination served A.M.'s best interests under section 2511(b). *See* Trial Court Opinion, 2/24/22, at 29-39. For example, Father "never graduated beyond supervised visits," and A.M. "does not recognize him as her father." *Id.* at 32. On the other hand, A.M. "has only known her Foster Parent as a parental figure for her entire life and has a parental bond with her Foster Parent." *Id.* at 33. We also adopt the trial court's analysis in affirming termination of Father's parental rights pursuant to Section 2511(b).

For the above reasons, we discern no error by the trial court, and adopt its opinion in affirming the termination of Father's parental rights and change of A.M.'s permanency goal to adoption. *See* Trial Court Opinion, 2/24/22, at 1-39.

Decree affirmed. Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/13/2022

Filed 3/3/2022 7:46:00 PM Superior Court Eastern District
2509 EDA 2021

# IN THE COURT OF COMMON PLEAS
# FOR THE COUNTY OF PHILADELPHIA
# FAMILY COURT DIVISION

| | | |
|---|---|---|
| In the Interest of A.Y.M., a Minor | : | CP-51-DP-0001591-2019 |
| a/k/a A.M. | : | CP-51-AP-0000364-2021 |
| | : | |
| | : | FID:   51-FN-376660-2009 |
| | : | |
| APPEAL OF: K.I., Father | : | 2509 EDA 2021 |
| | : | 2510 EDA 2021 |

## OPINION[1]

**Fernandes, J.:**

Appellant K.I. ("Father") appeals from the orders entered on November 9, 2021 granting the petitions filed by the Philadelphia Department of Human Services ("DHS"), to involuntarily terminate Father's parental rights to A.Y.M. ("Child"), pursuant to the Adoption Act, 23 Pa.C.S.A. §2511(a)(1), (2), (5), (8) and (b), and to change Child's permanency goal from reunification to adoption, pursuant to 42 Pa.C.S.A. §6351. Melanie Silverstein, Esquire, counsel for Father ("Father's Counsel"), filed timely Notices of Appeal with Statements of Matters Complained of on Appeal pursuant to Rule 1925(b) on December 7, 2021.

## Factual and Procedural Background:

Child's Mother[2] has been known to DHS since August 2011, pursuant to another dependency matter involving Child's older siblings[3].

On October 7, 2019, DHS received a GPS report alleging that Mother had given birth to Child on October 5, 2019, at Temple University Hospital ("TUH"); that Child was born at 39 weeks and 6

---

[1] The trial court requested the Notes of Testimony for August 13, 2021; November 3, 2021; and November 9, 2021, on November 10, 2021. The Notes of Testimony for August 13, 2021, were already available at the time of the initial court request. The Notes of Testimony for November 9, 2021, were received on December 14, 2021. Follow-up requests for the November 3, 2021, Notes of Testimony were sent on December 14, 2021; January 10, 2022; January 20, 2022, and January 25, 2022. The Notes of Testimony for November 3, 2021, were received on January 26, 2022.
[2] Mother filed her own appeal in this matter under EDAs 2578 and 2579 of 2021. A separate opinion will be filed on her appeal.
[3] Child has six siblings. None of them are involved in this appeal. Father is not the father of Mother's other children.

days gestation and weighed 6 pounds and 5.9 ounces; that Mother tested positive for marijuana in June 2019, during her pregnancy with Child; that Mother stopped the use of marijuana when she was five months pregnant with Child; that Mother and Child tested negative for substances at delivery; that there were concerns that Mother did not have custody of her other children; that Mother's other children were in DHS custody; that Mother and Child were scheduled for discharge on October 7, 2019; and that it was requested DHS authorize Child's discharge to Mother. DHS also learned that Child appeared to be healthy and Mother was employed; that Mother had a history of depression and substance use, specifically marijuana; that Father was involved in Child's care and that Mother was prepared to care for Child with the proper supplies. The report was determined to be valid. DHS spoke with hospital staff at TUH on October 7, 2019. It was confirmed that Mother and Child were ready to be discharged. DHS also learned that Mother had not been forthcoming with information regarding the custody of her other children. DHS then visited TUH on October 7, 2019. DHS spoke with Mother and Child's Maternal Aunt. DHS was informed that Mother was residing with Maternal Aunt. Maternal Aunt expressed interest in being a resource for Child and admitted having DHS involvement in the 1990s. DHS conducted clearances for Maternal Aunt, and she did not pass the clearance process. Maternal Aunt also named her step-daughter and step-daughter's brother as possible resources for Child. DHS conducted clearances for these individuals, and conducted a home assessment on October 8, 2019, but determined the home was not appropriate due to structural damages and needed repairs.

DHS also met with Father at TUH on October 7, 2019. Father did not name a possible resource for Child and did not reveal his address to DHS. When asked for his address, Father told DHS to ask Mother for his address. Mother stated she did not know Father's address.

On October 8, 2019, DHS obtained an OPC for Child and she was placed in foster care through Children's Choice, Inc. The trial court held a shelter care hearing for Child on October 10, 2019, where the OPC was lifted and the temporary commitment to DHS was ordered to stand. Counsel was appointed for Father at this date. The trial court then held an adjudicatory hearing for Child, on October 18, 2019, where Child was adjudicated dependent. The temporary commitment was discharged, and Child was fully committed to the custody of DHS. The court ordered that Father: avail himself to DHS; be referred to the Achieving Reunification Center ("ARC") for parenting,

housing, and employment services; and sign all necessary releases. A Family Service Plan ("FSP") meeting was ordered to be held within twenty days. Father was permitted supervised visitation with Child at the agency. Father failed to attend this hearing.

DHS held an FSP meeting on November 14, 2019. Father's whereabouts were unknown at the time. Child's primary goal was reunification, and her concurrent goal was adoption. Father's objectives were: to make his whereabouts known to DHS; comply with his court-ordered visitation with Child; attend ARC services; allow a home assessment and clearances if needed; participate in a substance abuse and mental health assessment; and provide proof of income.

On or about January 8, 2020, DHS learned Mother had been compliant with visitation, but Father's whereabouts remained unknown. The trial court held a permanency review hearing for Child on January 10, 2020. Child's placement remained necessary and appropriate. Father was found to have no compliance with the permanency plan, with minimal progress toward alleviating the circumstances necessitating Child's placement. The court ordered Child remain as placed and committed, and ordered a Parent Locator Service ("PLS") search be conducted as to Father. The court also ordered Father: make his whereabouts known to DHS; attend parenting services or family school; and allow DHS or Community Umbrella Agency ("CUA") to conduct a home assessment and necessary clearances. DHS/CUA was also ordered to explore any substance abuse or mental health history as to Father. The court found aggravated circumstances as to Mother. Father failed to attend this hearing.

On or about March 12, 2020, DHS obtained updates regarding Mother, and learned that Father's whereabouts still remained unknown. On May 22, 2020, DHS held an FPS meeting. Child's primary goal was reunification with a concurrent goal of adoption. Father's objectives remained the same. A hearing on June 9, 2020, was continued due to technical issues.

The trial court held a permanency review hearing for Child on October 5, 2020. Child's placement remained necessary and appropriate. The court found there had been no progress in alleviating the circumstances necessitating Child's placement and no compliance with the permanency plan as to Father. The court also found that Father had not availed himself to CUA, nor had he attended any visits with Child for the life of the case. The court again ordered a PLS search be done on Father.

DHS held an FSP meeting on October 15, 2020. Child's primary goal remained reunification with her concurrent goal remaining adoption. Father's objectives remained the same. Father failed to attend this meeting.

On February 5, 2021, DHS learned that Father was contacted on January 6, 2021. Father reported he was interested in visitation and reunification with Child, and that he was employed as a truck driver. The hearing scheduled for February 8, 2021, was continued after a request for the case to be heard by a judge. DHS held an FSP meeting on March 8, 2021. Father's objectives remained the same.

The trial court held a permanency review hearing for Child on March 25, 2021. Child's placement remained necessary and appropriate. Father was minimally compliant with the permanency plan and there had been minimal progress in alleviating the circumstances necessitating Child's placement. Father was ordered to: maintain consistent contact with DHS; provide proof of employment and his work schedule; complete a housing workshop and locate appropriate housing; provide a copy of his lease to DHS and allow clearances to be conducted on all individuals in the home; attend a parenting program until family school re-opened; and be referred to Community Behavioral Health ("CBH") for a consultation and/or evaluation. The court also ordered that DHS provide Father with all appropriate resources, and consult with CBH to determine any history of mental health issues as to Father. The court also ordered that voluntary relinquishments of parental rights be explored with Father. Father attended this hearing.

DHS filed petitions to involuntarily terminate Father's parental rights and change Child's permanency goal to adoption on July 8, 2021. The trial court began the termination and goal change trial on August 13, 2021, and continued the trial on November 3 and November 9, 2021. Father was in attendance all three days. The court heard testimony from Father, Mother the original DHS Social Worker, the current DHS Social Worker, and a Foster Care Worker. After hearing three days of testimony and evidence, the trial court rendered its decision on November 9, 2021, finding clear and convincing evidence to involuntarily terminate Father's parental rights to Child pursuant to 23 Pa.C.S.A. §2511(a)(1), (2), (5), (8), and (b), and change Child's goal to adoption. Father's Counsel timely filed this appeal on behalf of Father on December 7, 2021.

**Discussion:**

On appeal of the involuntarily termination of Father's parental rights, Father avers that:

1. The trial court abused its discretion by involuntarily terminating Father's parental rights under the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a) (5), and (a) (8).

2. The evidence was insufficient for the trial court to find, by clear and convincing evidence, to terminate Father's parental rights under the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a) (5), and (a) (8).

3. The trial court abused its discretion by determining that terminating Father's parental rights would best serve the child's physical and emotional needs and welfare pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(b).

4. The evidence was insufficient for the trial court to find, by clear and convincing evidence, that terminating Father's parental rights would best serve the child's physical and emotional needs and welfare pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(b).

On appeal of Child's goal change to adoption, Father asks:

1. Whether the trial court abused its discretion by changing the child's permanency goal to adoption when there was insufficient clear and convincing evidence to support the determination of such a goal change?

2. Whether the trial court abused its discretion by changing the child's permanency goal to adoption when there was insufficient clear and convincing evidence to support that such a goal would best serve the child's physical and emotional needs and welfare?

The grounds for involuntary termination of parental rights are enumerated in the Adoption Act at 23 Pa.C.S.A. §2511(a), which provides the following grounds for §2511(a)(1):

> **(a) General rule** - The rights of a parent, in regard to a child, may be terminated after a petition is filed on any of the following grounds:
>
> (1) The parent, by conduct continuing for a period of at least six months immediately preceding the filing of the petition, has either evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

In proceedings to involuntarily terminate parental rights, the burden of proof is on the party seeking termination, which must establish the existence of grounds for termination by clear and convincing evidence. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994). The clear and convincing standard means the evidence "is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *Matter of Sylvester*, 555 A.2d 1202, 1203-1204 (Pa. 1989). To satisfy Section (a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. However, the six-month time period should not be applied mechanically; instead, the court must consider the whole history of the case. *In re B.N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004). A child needs love, protection, guidance, and support. Both physical and emotional needs cannot be met by a merely passive interest in the development of the child. The parental obligation is a positive duty, which requires affirmative performance. It requires continuing interest in the child and a genuine effort to maintain communication and association with the child. At the same time, the trial court shall not consider any efforts by the parent to remedy the conditions which brought the child into care which are first initiated subsequent to the giving notice of the filing of the termination petition. *Id*.

The petition to involuntarily terminate Father's parental rights to Child was filed on July 8, 2021. Father's FSP objectives included: housing, employment, supervised visits, parenting classes, provide proof of income, and comply with an assessment for drug and alcohol and mental health concerns. (N.T. 11/03/21, pg. 81). Father's FSP objectives were developed at the start of the case in November 2019, not in January 2021, when he re-availed to DHS. (N.T. 11/03/21, pg. 116). Father was aware of his FSP objectives. The original DHS Social Worker provided Father with her contact information at the hospital the day of Child's birth, following their conversation. (N.T. 11/03/21, pgs. 75-76). Father had no contact with the DHS Social Worker from October 8, 2019, to January 2021. (N.T. 11/03/21, pg. 79). The original DHS Social Worker also mailed copies of the FSP and objectives to Father between November 2019 and January 2021. Father testified that the original DHS Social Worker reviewed the plan and Father's goals with him when he got in touch with her again in January 2021. (N.T. 11/03/21, pgs. 53, 127-128). The current DHS Social Worker spoke to Father when she took over the case in April 2021 and discussed his FSP with

him. (N.T. 08/13/21, pg. 72; N.T. 11/03/21, pgs. 162-163). After getting in touch with DHS again in January 2021, Father continued to have inconsistent contact with DHS, which Father admitted. (N.T. 11/03/21, pg. 34). Father stated he did not recall reaching out to the DHS Social Worker a second time between January and April of 2021. (N.T. 08/13/21, pg. 49). Father stated his contact with the agency was "mostly on a need to basis" and he only reached out if he had questions. (N.T. 11/03/21, pgs. 34-35). Father could not say how frequently he reached out to DHS, but indicated it could be monthly or every several months. (N.T. 11/03/21, pgs. 34-35). When the current DHS Social Worker was assigned in April 2021, she attempted to reach out to Father in multiple formats and on multiple occasions, but was not able to contact Father until late July 2021. (N.T. 11/03/21, pg. 165; N.T. 11/09/21, pg. 25). DHS filed termination and goal change petitions in early July 2021.

Father testified to completing four programs at ARC – housing, finance, parenting, and a fourth he could not recall. (N.T. 08/13/21, pg. 78). At the continuation of the trial on November 3rd, Father testified he had only completed three programs – housing, finance, and parenting. (N.T. 11/03/21, pg. 14). The current DHS Social Worker had documentation that Father completed housing, finance, and parenting programs at ARC. (N.T. 11/03/21, pg. 176; see also Father Exhibits 1-3). Father completed a finance workshop on March 22, 2021; a housing workshop on April 7, 2021; and a parenting class on July 19, 2021. (N.T. 11/03/21, pg. 176; N.T. 11/-9/21, pgs. 15-17; see also Father Exhibits 1-3). Father testified to having two[4] jobs – one full-time and one part-time job, which had been full time but reduced to part time so Father could attend ARC. (N.T. 11/03/21, pg. 17). Father provided paystubs for both jobs to the DHS Social Worker. (N.T. 08/13/21, pg. 77; N.T. 11/03/21, pg. 17). Father's paystubs created confusion regarding Father's residential address as each job listed a different address for Father. (N.T. 11/03/21, pg. 178). Father did not clarify the address situation when asked by DHS. (N.T. 11/09/21, pg. 46). The most recent paystub DHS obtained from Father was from late July 2021. (N.T. 11/09/21, pg. 46).

Father stated he provided DHS with his current address in January 2021. (N.T. 11/03/21, pg. 30). Father also testified that his home was not appropriate housing for reunification, due to his name not being on the lease. (N.T. 11/03/21, pg. 31). As of the second trial date, Father had not begun

---

[4] DHS stipulated to Father working two jobs. (N.T. 11/03/21, pg. 54).

the process of adding his name to the lease because he "didn't see a reason for it." (N.T. 11/03/21, pg. 32). The original DHS Social Worker had scheduled a home assessment in March of 2021, but Father stated he was moving in June 2021 and wanted to reschedule the assessment for after he moved. (N.T. 11/03/21, pgs. 82, 128). The home assessment was never rescheduled, and as far as DHS was aware and as Father testified, he remained at the same address since January 2021. (N.T. 11/03/21, pgs. 30, 82, 128). Father never requested a housing assessment of any address. (N.T. 11/09/21, pg. 46). The current DHS Social Worker testified that in July 2021, Father had stated he "was hoping to obtain housing by August" 2021. (N.T. 11/03/21, pg. 165). On July 20, 2021, Father reported an address on Joyce Street to the DHS Social Worker, but email correspondence indicated he had left that address in December 2020, and then on August 2, 2021, he reported an address on Spark Street. (N.T. 11/03/21, pgs. 166-167). As of an FPS meeting on September 29, 2021, Father still did not have appropriate, stable, and safe housing. (N.T. 11/03/21, pg. 178; N.T. 11/09/21, pg. 27). As of the final TPR trial date, the DHS Social Worker could not state with certainty where Father actually lived. (N.T. 11/09/21, pgs. 46-47).

Father claimed that no one asked him to sign and authorizations, consents, or releases. (N.T. 11/03/21, pg. 55). However, the DHS Social Worker testified that Father signed releases quickly when given them initially. (N.T. 11/03/21, pgs. 84-85). Father testified he never received any mental health treatment. (N.T. 11/03/21, pgs. 56, 59). Father also testified to have no history of drug or alcohol problems, and that he could not drink alcohol due to his Crohn's disease. (N.T. 11/03/21, pgs. 56, 59). However, Father also admitted to drinking in the past in response to questioning regarding social media photos of Father allegedly holding up a bottle of Jack Daniels. (N.T. 11/03/21, pgs. 63-65). It was the current DHS Social Worker's understanding that Father was not referred to BHS, and that he would be referred to CEU if DHS discovered any substance abuse history. (N.T. 11/09/21, pg. 18). Community Behavioral Health reported that Father had no history of mental illness. (N.T. 11/09/21, pgs. 18-19). Father was not referred to CEU. (N.T. 11/09/21, pg. 21).

Father never asked the DHS Social Worker if Child had medical care, doctor appointments, dental needs, or about any other well-being issues. (N.T. 08/13/21, pg. 73; N.T. 11/03/21, pgs. 84, 163, 177). Father stated he never asked, because he had assumed Child was up to date after Child had

missed a visit due to a doctor's appointment. (N.T. 08/13/21, pg. 73). Father never asked anyone why Child had had the doctor's appointment that caused her to miss a visit. (N.T. 08/13/21, pgs. 73-74). Father did not ask who Child's doctor was. (N.T. 08/13/21, pg. 74; N.T. 11/03/21, pg. 45). Father never attended any of Child's medical appointments, or dental appointments. (N.T. 08/13/21, pg. 76; N.T. 11/03/21, pgs. 45, 47). Father stated he never attended Child's appointments "due to COVID." (N.T. 11/03/21, pgs. 45, 47). Father also assumed he could not access Child's medical information since she is not in his care, but Father also stated he never asked DHS about the issue or for medical updates. (N.T. 11/03/21, pgs. 45-47). Father claimed he did not ask for various information about Child, her heath, and other case information because he did not know he could ask. (N.T. 08/13/21, pg. 74; N.T. 11/03/21, pg. 46). Father had his first visit with Child since her birth in October 2019, in January 2021, after approximately fifteen months. (N.T. 08/13/21, pgs. 38-39; N.T. 11/03/21, pgs. 22, 114; 11/09/21, pg. 9). For the first fifteen months of his Child's life, Father had no contact with his Child. Father did not know what Child looks like. At his first visit, Father testified that he asked a lot of questions to learn what he needed to do to gain custody of Child. (N.T. 08/13/21, pgs. 39, 42). He later testified that he knew he had to ask questions, but still did not ask necessary questions, and waiting for information to be given to him. (N.T. 08/13/21, pg. 50). Father was provided information on how to schedule additional visits with Child. (N.T. 11/03/21, pg. 114). Father was eligible for weekly supervised visits. (N.T. 11/03/21, pg. 85). Despite having the information on how to schedule more visits from multiple sources, Father did not request another visit at the time of the initial visit. (N.T. 11/03/21, pgs. 114-115). Between January 2021 and April 2021, Father only had one virtual visit with Child. (N.T. 08/13/21, pgs. 44-45; N.T. 11/03/21, pgs. 83-85). DHS had no reason from Father as to why only one visit occurred. (N.T. 11/09/21, pgs. 28-29, 42-43). Father also claimed he did not know he needed to reach out to schedule visits and stated that he believed he became more involved with visits after a hearing on March 25, 2021, where the court ordered him again to attend all visits in-person. (N.T. 08/13/21, pg. 45; N.T. 11/03/21, pgs. 169, 173, 175). Between April and June 2021, Father attended eight virtual visits. (N.T. 11/03/21, pg. 169; N.T. 11/09/21, pg. 11). The current DHS Social Worker and the Foster Care Worker were not aware of why the visits were virtual rather than in person, despite being court ordered. (N.T. 11/03/21, pgs. 169-170; N.T. 11/09/21, pgs. 11, 168). Father gave no reasonable explanation for violating the in-person visit court order.

Father chose to attend infrequent virtual visits only. Since July 22, 2021, Father attended weekly supervised visits in-person. (N.T. 11/03/21, pg. 169; N.T. 11/09/21, pg. 180). Father has been appropriate, with no re-direction needed, but Father did not become consistent in his visitation until after TPR and goal change petitions were filed in early July 2021. (N.T. 11/03/21, pgs. 172-173). Father never graduated beyond supervised visits. (N.T. 11/09/21, pg. 48).

Father has four other children from a long-term relationship with a former paramour. (N.T. 08/13/21, pgs. 18, 23, 33). Father was absent from Child's life from her birth until January 2021. During this period of absence, from October 2019 until January 2021, Father did not provide child support, gifts, or any other support, and did not have contact with Child, Mother, or anyone else involved in the case. (N.T. 08/13/21, pgs. 25, 33-34; N.T. 11/03/21, pg. 80). DHS attempted to contact Father on multiple occasions in multiple formats throughout this period of absence and conducted a PLS on Father. Father did not attempt to reach out to Mother or DHS between October 2019 and January 2021; however, during that same period, he made frequent contact with his prior paramour to check-in on his four other children and saw them "probably twice a week" or "every other week." (N.T. 08/13/21, pgs. 35, 37). Father testified he currently saw his four other children "[a]t least three to four times a week." (N.T. 11/03/21, pgs. 32-33). When asked why Father was able to overcome various barriers to see his other four children, Father stated "I don't really have an answer for that." (N.T. 08/13/21, pg. 53).

Outside of developing a bond with his Child at visits, the current DHS Social Worker testified housing was Father's main outstanding objective. Father was minimally compliant with his FSP objectives prior to the TPR and goal change petitions being filed. (N.T. 11/03/21, pg. 180-181; N.T. 11/09/21, pg. 27). Father had made minimal progress toward alleviating the circumstances necessitating Child's placement. (N.T. 11/03/21, pgs. 181-182). For the entire six-month period prior to the petition being filed in early July 2021, Father failed to engage with or complete all his objectives and place himself in a position to parent. Father completed a finance workshop and a housing workshop through ARC prior to the petitions being filed but did not complete parenting until after the petitions were filed. Father was entirely absent from Child's life for over a year and a half, and once he did re-avail himself, Father did not visit consistently until after the termination and goal change petitions were filed and visited virtually despite court-order to visit in-person.

Father has showed a passive interest in fulfilling his parental duties toward this Child. Although Father ignored this Child, even though he was aware of her birth, Father maintained regular weekly contact with his four other children from a previous relationship. Father's answer as to why he could maintain contact and develop a bond with the other children but not this Child was, "I don't really have an answer for that." (N.T. 08/13/21, pg. 53). Father must exercise reasonable firmness in resisting obstacles placed in the path of maintaining a parent-child relationship. Father still does not have appropriate, stable, and safe housing. Father has not taken the steps to obtain appropriate housing. Father works two jobs; therefore, finding housing is not beyond his efforts. Additionally, Father questioned his paternity of Child. At of the start of the termination trial, Father still questioned his paternity, but never requested a paternity test of the court. (N.T. 08/13/21, pgs. 40-41, 52). By his conduct, Father is unable to meet both the physical and emotional needs of the Child. Father's parental duty requires affirmative performance; it was not until Father was given notice of the filing of termination and goal change petitions that Father started to comply with in-person visits. Under the Adoption Act, the court cannot consider these efforts of Father. The DHS Social Workers respective testimonies were credible. Father was not credible. The trial court found by clear and convincing evidence that Father, by his conduct, had failed to perform his parental duties and has evidenced a settled purpose to relinquish his parental claim to Child. Father has an affirmative duty to complete his FSP objectives, show interest in Child, and a genuine effort to maintain communication and association with Child. Termination under 23 Pa.C.S.A. §2511(a)(1) was proper and the court did not err or abuse its discretion.

The trial court also terminated Father's parental rights under 23 Pa.C.S.A. §2511(a)(2). This section of the Adoption Act provides that parental rights may be terminated after a showing that:

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for [her] physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

§2511(a)(2) is not limited to affirmative misconduct. It may include acts of refusal to perform parental duties, as well as incapacity to perform those duties. *In re A.D.*, 93 A.3d 888, 895-896 (Pa. Super. 2014). Further, adequate parenting requires action, not simply intent. *In re A.L.D.*, 797

A.2d 326, 340 (Pa. Super. 2002) (quoting *In re J.W.*, 578 A.2d 952, 959 (1990)). Parents must also make diligent efforts to resume assumption of full parental responsibilities within a reasonably prompt period. *In re A.D., supra.* This section focuses on the child's present and future need for essential parental care, control, or subsistence necessary for their physical or mental well-being. *In re Adoption of M.J.H.*, 501 A.2d 648, 654 (Pa. Super. 1985). While there may not be an explicit list of required and specific parental duties, at minimum a child needs love, protection, guidance, and support. *In re K.Z.S.*, 946 A.2d 737, 759 (Pa. Super. 2008). A passive interest in the child is not enough; rather a parent must fulfill their obligation through affirmative performance by utilizing all available resources and exercise reasonable firmness in resisting obstacles. *Id.* Even if a parent demonstrates love for their child or makes efforts to perform their duties, if a parent's incapacity cannot be remedied within a reasonable period, their parental rights may be terminated. *In re Adoption of M.J.H., supra.*

Child has been in care since October 2019, approximately twenty-two months at the start of the termination trial. (N.T. 08/13/21, pg. 10). By the time the trial concluded, and a decision was rendered, Child was in continuous DHS care for approximately twenty-five months. Child was born October 5, 2019, and has been in care since days after her birth. (N.T. 08/13/21, pgs. 11).

Child's case came into care when a GPS report was submitted after Child's birth. Mother did not have custody of her other children. (N.T. 11/03/21, pgs. 73-74). After receiving the report, a DHS Social Worker went to the hospital to meet with Mother and Child on October 7, 2019. (N.T. 11/03/21, pg. 74). At that time, DHS learned that Mother had no stable housing, Mother was working, and Mother reported previous treatment for depression but no current treatment. (N.T. 11/03/21, pgs. 74-75). Father testified that he and Mother were never in a relationship, but had been co-workers at a previous mutual employer. (N.T. 08/13/21, pgs. 14, 16; N.T. 11/03/21, pg. 20). Father also testified he had been involved with Mother "for some months" and their involvement ended shortly after Child was born. (N.T. 08/13/21, pg. 16). Father was aware of Mother's pregnancy and Child's birth, and was present at the hospital shortly after the birth. (N.T. 08/13/21, pg. 13; N.T. 11/03/21, pg. 75). Father was present at the hospital when DHS was there on October 7, 2019. (N.T. 11/03/21, pg. 75). Father spoke with the DHS Social Worker at the hospital and reported he could not provide housing for Child due to his then-existing long-term

relationship, and he did not have any other family or friends to care for Child. (N.T. 08/13/21, pg. 20; N.T. 11/03/21, pg. 75). Father's long-term relationship lasted approximately twelve years and produced four other children. (N.T. 08/13/21, pgs. 18, 23, 33). The original DHS Social Worker provided Father with her contact information at the hospital following their conversation. (N.T. 11/03/21, pgs. 75-76). Father stated his understanding of Child's discharge plan after birth was essentially that Mother "would get it handled" and so he "deterred [his] focus on trying to gain stable [] housing." (N.T. 08/13/21, pg. 19). The DHS Social Worker reported that Father left the hospital "prior to knowing what the plan was for [Child]." (N.T. 11/03/21, pg. 77). The DHS Social Worker reached out to Father again via phone on October 8, 2019, to explain the situation and that Child would have to go into foster care. (N.T. 08/13/21, pgs. 22-23; N.T. 11/03/21, pgs. 77-78). On this phone call, Father stated he had no family or friends, he was unable to care for Child, said he had to go to work, and hung up. (N.T. 11.03/21, pg. 78). Father declined to provide DHS with his address, and instructed DHS to "go through [M]other." (N.T. 11/03/21, pgs. 79, 115). The original DHS Social Worker could not recall any contact with Father between the October 8, 2019, phone call and January 2021. (N.T. 11/03/21, pg. 79). DHS conducted a PLS on Father and once they obtained an address in May 2020, DHS began sending letters to Father with information about his FSP and FSP meetings. (N.T. 11/03/21, pgs. 79-80, 115, 125-126). These letters also included the DHS Social Worker's contact information. (N.T. 11/03/21, pg. 80). The court also mailed Father court orders. (N.T. 11/03/21, pg. 80). The DHS Social Worker attempted to call Father as well. (N.T. 11/03/21, pg. 126). Despite attempts, there was no contact with Father until January 2021. (N.T. 11/03/21, pg. 115).

Father's FSP objectives included: housing, employment, supervised visits, parenting classes, provide proof of income, and comply with an assessment for drug and alcohol and mental health concerns. (N.T. 11/03/21, pg. 81). Father's FSP objectives were developed at the start of the case in November 2019, not in January 2021, when he re-availed to DHS. (N.T. 11/03/21, pg. 116). Father was aware of his FSP objectives. The current DHS Social Worker spoke to Father when she took over the case in April 2021 and discussed his plan with him. (N.T. 08/13/21, pg. 72; N.T. 11/03/21, pgs. 162-163). Father also testified that the original DHS Social Worker reviewed the plan and Father's goals with him when he re-availed in January 2021. (N.T. 11/03/21, pgs. 53, 127-128).

Father had inconsistent contact with the DHS Social Worker. Father re-availed to DHS in January 2021, and testified to calling DHS on January 1, 2021. (N.T. 08/13/21, pg. 27). The DHS Social Worker informed Father of his FSP goals and objectives. (N.T. 11/03/21, pg. 81). The DHS Social Worker also emailed Father court orders and Child's foster care worker's information to set up supervised visits, after receiving his email address. (N.T. 11/03/21, pgs. 81, 114). Father admitted to inconsistent contact with DHS. (N.T. 11/03/21, pg. 34). Father stated his contact with the agency was "mostly on a need to basis" and he only reached out if he had questions. (N.T. 11/03/21, pgs. 34-35). Father could not say how frequently he reached out to DHS, but indicated it could be monthly or every several months. (N.T. 11/03/21, pgs. 34-35). When the current DHS Social Worker was assigned in April 2021, she attempted to reach out to Father in multiple formats and on multiple occasions, but was not able to contact Father until late July 2021. (N.T. 11/03/21, pg. 165; N.T. 11/09/21, pg. 25). The current Social Worker attempted to reach out to Father, in April 2021, via the email Father provided on the record and no one responded, so she assumed it was a wrong email, but Father responded via that same email in August 2021. (N.T. 11/09/21, pg. 42).

Father testified his housing was unstable for approximately a year after his separation with his prior paramour. (N.T. 08/13/21, pg. 18). Father stated he provided DHS with his current address in January 2021. (N.T. 11/03/21, pg. 30). Father also testified that his home was not housing for reunification due to his name not being on the lease. (N.T. 11/03/21, pg. 31). As of the second trial date, Father had not begun the process of adding his name to the lease because he "didn't see a reason for it." (N.T. 11/03/21, pg. 32). Father stated he was looking for different housing, via avenues such as Zillow and Hotpads.com, as well as a realtor. (N.T. 11/03/21, pg. 55). Father believed his only outstanding goal was to "gain some sort of residency," and asserted he had done everything else that had been asked of him. (N.T. 11/03/21, pg. 56). The original DHS Social Worker testified that they had scheduled a home assessment in March of 2021, but since Father claimed he was moving in June 2021, he wanted to reschedule the assessment for after he moved. (N.T. 11/03/21, pgs. 82, 128). The home assessment was never rescheduled, and as far as DHS was aware and as Father testified, Father remained at the same address since January 2021. (N.T. 11/03/21, pgs. 30, 82, 128). Father never requested or availed himself for a housing assessment of any address. (N.T. 11/09/21, pg. 46). The current DHS Social Worker testified that in July 2021, Father stated he "was hoping to obtain housing by August" 2021. (N.T. 11/03/21, pg. 165). On

July 20, 2021, Father reported an address on Joyce Street to the DHS Social Worker, but email correspondence indicated he had left that address in December 2020, and then on August 2, 2021, he reported an address on Spark Street. (N.T. 11/03/21, pgs. 166-167). At an FPS meeting on September 29, 2021, Father still did not have appropriate, stable, and safe housing. (N.T. 11/03/21, pg. 178; N.T. 11/09/21, pg. 27). As of the final TPR trial date, the DHS Social Worker could not state with certainty where Father actually lived. (N.T. 11/09/21, pgs. 46-47). Additionally, Father's paystubs presented further confusion regarding Father's address as each job listed a different address for Father. (N.T. 11/03/21, pg. 178). Father did not clarify the situation when DHS asked. (N.T. 11/09/21, pg. 46). As of the termination trial decision date, Father had still not obtained appropriate housing and it remained an outstanding objective.

Father had stable employment, but concerns remained. Father has two jobs – one full-time and one part-time job, which had originally been full-time but reduced to part-time so Father could attend ARC. (N.T. 11/03/21, pg. 17). Father stated he works from approximately 7:00 a.m. until 5:00 or 6:00 p.m. Monday through Friday, and then works 7:00 a.m. until 3:00 or 4:00 p.m. on Saturdays and Sundays. (N.T. 11/03/21, pgs. 48-49). Father indicated that should Child be returned to his care, he did not believe that his work schedule or medical complexities with Crohn's disease would be a barrier. (N.T. 11/03/21, pgs. 40-41). He stated that "adjustments can and will be made." (N.T. 11/03/21, pg. 41). Despite his history of chronic Crohn's disease, Father did not provide DHS with hospital records until midnight the day before the second trial date. (N.T. 11/03/21, pg. 179). Father indicated he has a younger sibling in Texas who would be "more than willing to help [Father] out." (N.T. 11/03/21, pg. 42). The DHS Social Worker had not heard of any family supports until the second trial date. (N.T. 11/03/21, pg. 177). Father never reached out to DHS to share who his family supports would be or ask for background checks and clearances. (N.T. 11/03/21, pgs. 43-44, 82). Father did not have a plan for Child's care while he is at work and had not identified a daycare. (N.T. 11/03/21, pgs. 44-45, 177).

Father initially testified to completing four programs at ARC – housing, finance, parenting, and a fourth he could not recall. (N.T. 08/13/21, pg. 78). At the next trial date, Father stated he only completed three programs through ARC – housing, finance, and parenting. (N.T. 11/03/21, pg. 14). The current DHS Social Worker had documentation that Father completed housing, finance,

and parenting programs. (N.T. 11/03/21, pg. 176; see also Father's Exhibits 1-3). Father completed a finance workshop on March 22, 2021; a housing workshop on April 7, 2021; and a parenting class on July 19, 2021. (N.T. 11/03/21, pg. 176; N.T. 11/-9/21, pgs. 15-17; see also Father's Exhibits 1-3).

Father testified that no one asked him to sign and authorizations, consents, or releases. (N.T. 11/03/21, pg. 55). The DHS Social Worker testified that Father signed releases quickly when given them initially. (N.T. 11/03/21, pgs. 84-85). Father stated he never received any mental health treatment. (N.T. 11/03/21, pgs. 56, 59). Father also reported no history of drug or alcohol problems, and that he could not drink due to his Crohn's disease. (N.T. 11/03/21, pgs. 56, 59). However, Father also admitted to drinking in the past in response to questioning regarding social media photos of Father allegedly holding up a bottle of Jack Daniels. (N.T. 11/03/21, pgs. 63-65). It was the current DHS Social Worker's understanding that Father was not referred to BHS, and that he would be referred to CEU if DHS discovered any substance abuse history. (N.T. 11/09/21, pg. 18). The current DHS Social Worker reached out to CBH, who also reported that Father had no history of mental illness. (N.T. 11/09/21, pgs. 18-19). Father was not referred to CEU. (N.T. 11/09/21, pg. 21).

While Father may have had stable employment, completed some programming at ARC, and may have been looking for appropriate housing, his absence from Child's life and inconsistent visitation was an issue. Father testified to being "pretty much absent for about a year" after Child's birth. (N.T. 08/13/21, pg. 24). It was approximately fifteen months from Child's birth before Father had his first visit with Child. Father did not see Child again after her birth in October 2019, until January 2021. (N.T. 08/13/21, pg. 26). During this period of absence, from October 2019 until January 2021, Father did not provide child support, gifts, or any other support, and did not have contact with Child, Mother, or anyone else involved in the case. (N.T. 08/13/21, pgs. 25, 33-34; N.T. 11/03/21, pg. 80). However, during that same period, Father had frequent contact with his prior paramour to check-in on his four other children and saw them "probably twice a week" or "every other week." (N.T. 08/13/21, pgs. 35, 37). Father testified he currently saw his four other children "[a]t least three to four times a week." (N.T. 11/03/21, pgs. 32-33). When asked why Father was able to overcome various barriers to see his other children but not to see Child, Father

stated "I don't really have an answer for that." (N.T. 08/13/21, pg. 53). Father expressed doubt as to whether Child was his biological child. (N.T. 08/13/21, pgs. 32, 40-41, 51-52). However, despite the claimed doubts, Father never requested a paternity test. (N.T. 08/13/21, pg. 51). As of the start of the termination trial, Father testified he still doubted his paternity of Child. (N.T. 08/13/21, pgs. 40-41, 52). Father also testified that at the March 2021 hearing, he did not question Child's paternity, but also did not want "a paternity test or the results of a paternity test determine [sic] whether or not [he] can raise a child or not, or [] be a part of a child's life." (N.T. 08/13/21, pg. 51). At the second trial date, Father testified he did not question his paternity to Child. (N.T. 11/03/21, pg. 18). Father testified he had not taken any steps to file a claim of paternity with the Department of State. (N.T. 11/03/21, pgs. 18-19).

After Father re-availed in January 2021, the original DHS Social Worker provided him with the necessary information to schedule visits with Child and instructed Father to reach out to schedule an initial visit. (N.T. 11/03/21, pgs. 81, 114). The foster care worker reported that Father did not contact her, and she had to reach out to Father to schedule his initial visit with Child. (N.T. 11/03/21, pgs. 81, 114). After not seeing Child since her birth in October 2019, Father had an initial visit with Child on January 21, 2021. (N.T. 08/13/21, pgs. 38-39; N.T. 11/03/21, pgs. 22, 114; 11/09/21, pg. 9). It was unclear whether this visit was in person or virtual as witnesses testified to both. During the visit, the foster care worker explained to Father how to schedule further visitation. (N.T. 11/03/21, pg. 114). Despite having this information from multiple sources, Father did not request another visit at the time of the initial visit. (N.T. 11/03/21, pgs. 114-115). Between January 2021 and April 2021, Father had only one virtual visit with Child. (N.T. 08/13/21, pgs. 44-45; N.T. 11/03/21, pgs. 83-85). Father was eligible for weekly supervised visits. (N.T. 11/03/21, pg. 85). DHS had no reason from Father as to why no other visits occurred. (N.T. 11/09/21, pgs. 28-29, 42-43). Father claimed he was unable to visit due to work schedule conflicts, and stated he had verbally informed DHS of his schedule, but also that he did not inform DHS of his schedule at all. (N.T. 08/13/21, pgs. 46-47). The DHS Social Worker was not made aware of any reason the agency could not facilitate visits, nor did Father ever express that he had any barriers to attending. (N.T. 11/03/21, pgs. 85-86, 131-132). Father claimed the DHS Social Worker never told him that she needed documentation of Father's work schedule. (N.T. 08/13/21, pg. 46). Father also claimed he did not know he needed to reach out to schedule visits and stated that he believed

he became more involved in visits after a court hearing on March 25, 2021, where he was court ordered to attend all visits in-person. (N.T. 08/13/21, pg. 45; N.T. 11/03/21, pgs. 169, 173, 175). Visits were virtual in the beginning of Father's involvement due to pandemic restrictions. (N.T. 08/13/21, pg. 65). Father did not ask about in-person visitation; a DHS worker had to address the topic with Father. (N.T. 08/13/21, pgs. 65-66). Father also testified he was unaware he could ask for more frequent or longer visits. (N.T. 08/13/21, pg. 73). Between April and June 2021, Father attended eight virtual visits. (N.T. 11/03/21, pg. 169; N.T. 11/09/21, pg. 11). The current DHS Social Worker and the Foster Care Worker were not aware of why the visits were virtual rather than in-person, despite being court ordered. (N.T. 11/03/21, pgs. 169-170; N.T. 11/09/21, pgs. 11, 168). Since July 22, 2021, Father attended weekly supervised visits in-person. (N.T. 11/03/21, pg. 169; N.T. 11/09/21, pg. 180). Father's initial lack of visitation with Child was a concern to the DHS Social Worker, given that Father had already missed over a year of Child's life already and she did not know him as her Father. (N.T. 11/03/21, pg. 86). The current DHS Social Worker shared the concern that Father did not visit with Child until she was fifteen-months old, and the second in-person visit – apart from virtual visits – did not occur for another six months. (N.T. 11/03/21, pg. 170). Father has been appropriate and has not needed redirection during visits, , but Father did not become consistent with his in-person visitation until after TPR and goal change petitions were filed on July 8, 2021. (N.T. 11/03/21, pgs. 172-173). Additionally, while virtual visits can be credited to Father, "realistically, a one-and-a-half-year-old is not going to stay engaged virtually." (N.T. 11/03/21, pg. 172). Father never graduated beyond supervised visits. (N.T. 11/09/21, pg. 48). Father only attended sixteen hours of in-person visits with Child throughout the two years Child has been alive. (N.T. 11/03/21, pg. 195). Father does not do anything to provide for Child's needs outside of visitation. (N.T. 11/03/21, pgs. 109, 177; N.T. 11/09/21, pg. 49). During visits, Child recognizes Father in general but does not refer to him as her father and does not recognize him as her father. (N.T. 11/09/21, pgs. 86, 184). Child does not call Father anything, and Father only refers to Child as her name. (N.T. 08/13/21, pg. 61; N.T. 11/09/21, pgs. 183-184). Father testified that Child does not have any negative reaction when visits end. (N.T. 08/13/21, pg. 64).

Father also never asked the DHS Social Worker if Child had medical care, doctor appointments, dental needs, or other well-being issues. (N.T. 08/13/21, pg. 73; N.T. 11/03/21, pgs. 84, 163, 177).

The original DHS Social Worker testified this was a concern for her. (N.T. 11/03/21, pg. 84). Father testified that he never asked because he assumed Child was up to date after Child had missed a visit due to a doctor's appointment. (N.T. 08/13/21, pg. 73). Father never asked why Child had had the doctor's appointment that caused her to miss a visit. (N.T. 08/13/21, pgs. 73-74). Father did not ask who Child's doctor was. (N.T. 08/13/21, pg. 74; N.T. 11/03/21, pg. 45). At the termination trial, Father still did not know who Child's pediatrician was, but thought he may have a name somewhere. (N.T. 08/13/21, pg. 76; N.T. 11/03/21, pg. 45). Father never reached out to Child's doctor to see what appointments were scheduled or to inquire about her health. (N.T. 11/03/21, pg. 45). Father never attended any of Child's medical appointments, or dental appointments. (N.T. 08/13/21, pg. 76; N.T. 11/03/21, pgs. 45, 47). Father alleged he never attended appointments "due to COVID." (N.T. 11/03/21, pgs. 45, 47). Father assumed he could not access Child's medical information since she is not in his care, but Father also stated he never asked DHS about the issue or for medical updates. (N.T. 11/03/21, pgs. 45-47). Father claimed he did not ask for various information about Child, her health, and other case information because he did not know he could ask. (N.T. 08/13/21, pg. 74; N.T. 11/03/21, pg. 46). Father testified that neither the DHS Social Worker, nor anyone else at DHS or the foster agency, ever refused to give him information about Child when he asked. (N.T. 08/13/21, pgs. 74-76). Father stated he is comfortable with the care Child is currently receiving and had not asked DHS how Child's needs are met while in placement. (N.T. 11/03/21, pgs. 46-47).

Child does not depend on Father as an essential caregiver, in large part because Father missed nearly the entire first year and a half of Child's life. (N.T. 11/03/21, pg. 109). Child has a very strong attachment to her Foster Parent. (N.T. 11/09/21, pg. 203). It would be "[q]uite traumatic" for Child to be removed from her current placement. (N.T. 11/03/21, pg. 182). Child's relationship with her Foster Parent is "very loving" and the Foster Parent "is very attentive to [Child's] needs, provides [Child] with everything that she needs." (N.T. 11/03/21, pgs. 198-199). Child's Foster Parent's life "revolves around" Child. (N.T. 11/03/21, pg. 199).

When asked why Father did not inquire about the Child's well-being, her needs and medical care, Father's response was often that he did not know he could do certain things, despite also testifying he knew he needed to ask questions to get information. Father repeatedly stated that because this

was his "first time going through anything like this[,]" he was unsure how to address the situation. (N.T. 08/13/21, pgs. 22, 47, 50). It is hard to believe Father's testimony about not knowing to inquire about Child's well-being since Father is not a first-time parent. Father has four other older children that he is involved with from a previous relationship. Father also testified to asking a lot of questions during his first visit with Child to learn what he needed to do to gain custody of Child. (N.T. 08/13/21, pgs. 39, 42). He later testified that he knew he had to ask questions, but still did not ask questions. (N.T. 08/13/21, pg. 50). The current DHS Social Worker testified that no progress had been made toward alleviating the circumstances necessitating Child's placement. (N.T. 11/03/21, pgs. 181-182). Father was minimally compliant with his goals at the time the TPR and goal change petitions were filed. (N.T. 11/03/21, pg. 180-181; N.T. 11/09/21, pg. 27). Father failed to successfully complete all of his FSP objectives, apart from the completion of ARC programs and employment. Father had ample opportunity to put himself in a position to adequately parent and care for Child, but his repeated and continued incapacity has not been mitigated. Father is co-parenting and visiting his other four children, but has not done the same for this Child and continued to question his paternity of her. Father may interact well with Child, but he has shown a passive interest in fulfilling his parental duties towards this Child. Father has not made an effort to put himself in a position for safe reunification. Father still does not have adequate housing for reunification. Father is unable to meet Child's basic needs. The record established that Father has no plan to ensure the essential parental care, control, or subsistence necessary for Child's physical and mental well-being. Father did not re-avail into Child's life for nearly a year and a half after her birth, despite being aware of her placement in DHS custody. Father shows a passive interest in his Child and does not utilize all available resources to enhance his parenting and protective capacities to meet Child's needs. Father has not made a genuine effort to maintain communication and association with the Child. The testimony of the DHS Social Workers was credible. Father was not credible. Father has demonstrated an unwillingness to acknowledge or remedy the causes of his incapacity to parent in order to provide Child with the parental care, control, or subsistence necessary for her physical and mental well-being. Termination under 23 Pa.C.S.A. §2511(a)(2) was proper.

Father also appeals the trial court's termination of parental rights under 23 Pa.C.S.A. §2511(a)(5), which permits termination when a child was removed, by court or voluntary agreement, and placed

with an agency if, for at least six months, the conditions which led to the placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services reasonably available to the parent are not likely to remedy the conditions leading to placement, and termination best serves the child's needs and welfare. DHS, as a child and youth agency, cannot be required to extend services beyond the period of time deemed as reasonable by the legislature or be subjected to herculean efforts. A child's life cannot be put on hold in hope that the parent will summon the ability to handle the responsibilities of parenting. *In re J.T.*, 817 A.2d 505, 509 (Pa. Super. 2001). As a consequence, Pennsylvania's Superior Court has recognized that a child's needs and welfare require agencies to work toward termination of parental rights when a child has been placed in foster care beyond reasonable temporal limits and after reasonable efforts for reunification have been made by the agency, which have been ineffective. This process should be completed within eighteen months. *In re N.W.*, 851 A.2d 501, 508 (Pa. Super. 2004).

Child has been in care since October 2019, approximately twenty-two months at the start of the termination trial. (N.T. 08/13/21, pg. 10). By the time the trial concluded and a decision was rendered, Child had been in continuous DHS care for approximately twenty-five months. After speaking to the original DHS Social Worker at the hospital when Child was born and, on the phone shortly thereafter, Father had no contact with DHS again until January 2021. (N.T. 11/03/21, pgs. 79, 115). During this period of absence, DHS conducted a PLS on Father, called Father, sent emails, and sent letters to Father. Father's whereabouts were unknown for a period of approximately fifteen-months. Father's FSP objectives were developed at the start of the case in November 2019, not in January 2021 when he re-availed to DHS. (N.T. 11/03/21, pg. 116). Father's FSP objectives included: housing, employment, supervised visits, parenting classes, provide proof of income, and comply with an assessment for drug and alcohol and mental health concerns. (N.T. 11/03/21, pg. 81). Father was aware of his FSP objectives. The current DHS Social Worker spoke to Father when she took over the case in April 2021 and discussed his plan with him. (N.T. 08/13/21, pg. 72; N.T. 11/03/21, pgs. 162-163). Father also testified that the original DHS Social Worker reviewed the plan and Father's goals with him when he re-availed in January 2021. (N.T. 11/03/21, pgs. 53, 127-128). Upon re-availing to DHS, Father continued to have inconsistent contact with DHS. When the current DHS Social Worker was assigned in April 2021,

she attempted to reach out to Father in multiple formats and on multiple occasions, but was not able to contact Father until late July 2021. (N.T. 11/03/21, pg. 165; N.T. 11/09/21, pg. 25). The current DHS Social Worker attempted to reach out to Father, in April 2021, via the email Father provided on the record and no one responded, so she assumed it was a wrong email, but then Father responded via that same email in August 2021. (N.T. 11/09/21, pg. 42).

Father completed programming at ARC. The current DHS Social Worker confirmed that Father completed housing, finance, and parenting programs at ARC. (N.T. 11/03/21, pg. 176; see also Father's Exhibits 1-3). The current Social Worker reached out to CBH, who reported that Father had no history of mental illness. (N.T. 11/09/21, pgs. 18-19). Father was also not referred to CEU. (N.T. 11/09/21, pg. 21).

Father testified to having two jobs – one full-time and one part-time job, which had been full-time but reduced to part-time so Father could attend ARC. (N.T. 11/03/21, pg. 17). Father stated he works from approximately 7:00 a.m. until 5:00 or 6:00 p.m. Monday through Friday, and then works 7:00 a.m. until 3:00 or 4:00 p.m. on Saturdays and Sundays. (N.T. 11/03/21, pgs. 48-49). Father testified that he provided paystubs for both jobs to the DHS Social Worker. (N.T. 08/13/21, pg. 77; N.T. 11/03/21, pg.17). Father indicated that should Child be returned to his care, he did not believe that his work schedule or medical complexities would be a barrier. (N.T. 11/03/21, pgs. 40-41). Father indicated he has a younger sibling in Texas who would be "more than willing to help [Father] out." (N.T. 11/03/21, pg. 42). Father had previously indicated to the DHS Social Worker that he had no family or friends to assist in caring for Child. (N.T. 11/03/21, pg. 78). The DHS Social Worker had not heard of any family supports until the second trial date. (N.T. 11/03/21, pg. 177). Father never reached out to DHS to share who his family supports would be or ask for background checks and clearances. (N.T. 11/03/21, pgs. 43-44, 82). Father did not have a plan for Child's care while he is at work and had not identified a daycare. (N.T. 11/03/21, pgs. 44-45, 177).

Father testified to providing DHS with his current address in January 2021. (N.T. 11/03/21, pg. 30). Father also testified that his home was not housing for reunification due to his name not being on the lease. (N.T. 11/03/21, pg. 31). As of the second trial date, Father had not begun the process of adding his name to the lease because he "didn't see a reason for it." (N.T. 11/03/21, pg. 32).

The original DHS Social Worker testified that they had originally scheduled a home assessment in March of 2021, but Father claimed he was moving in June 2021 and wanted to reschedule the assessment for after he moved. (N.T. 11/03/21, pgs. 82, 128). The home assessment was never rescheduled, and as far as DHS was aware and as Father testified, he remained at the same address since January 2021. (N.T. 11/03/21, pgs. 30, 82, 128). Father never requested or availed himself for a housing assessment of any address. (N.T. 11/09/21, pg. 46). As of the final TPR trial date, the DHS Social Worker could not state with certainty where Father actually lived and whether his house is safe and appropriate. (N.T. 11/03/21, pg. 178; N.T. 11/09/21, pgs. 46-47).

Father did not see Child again after her birth in October 2019, until January 2021. (N.T. 08/13/21, pg. 26). During this period, Father did not provide child support, gifts, or any other support, and did not have contact with Child, Mother, or anyone else involved in the case. (N.T. 08/13/21, pgs. 25, 33-34; N.T. 11/03/21, pg. 80). However, during that same period, Father made frequent contact with his prior paramour to check-in on his four other children and saw them "probably twice a week" or "every other week." (N.T. 08/13/21, pgs. 35, 37). Father testified he currently saw his other children "[a]t least three to four times a week." (N.T. 11/03/21, pgs. 32-33). When asked why Father was able to overcome various barriers to see his other four children but not Child, Father stated "I don't really have an answer for that." (N.T. 08/13/21, pg. 53). After Father re-availed in January 2021, the original DHS Social Worker provided him with the necessary information to schedule visits with Child and instructed Father to reach out to schedule an initial visit. (N.T. 11/03/21, pgs. 81, 114). The foster care worker reported that she had to reach out to Father to schedule his initial visit with Child. (N.T. 11/03/21, pgs. 81, 114). After not seeing Child since her birth in October 2019, Father had an initial visit with Child on January 21, 2021. (N.T. 08/13/21, pgs. 38-39; N.T. 11/03/21, pgs. 22, 114; 11/09/21, pg. 9). Father did not request a second visit at that time and did not have another visit with Child until April 2021. (N.T. 11/03/21, pgs. 83-85, 114-115). Father was eligible for weekly supervised visits. (N.T. 11/03/21, pg. 85). DHS had no reason from Father as to why no other visits occurred. (N.T. 11/09/21, pgs. 28-29, 42-43). Father also claimed he did not know he needed to reach out to schedule visits, despite multiple individuals providing him the information to schedule visits, and stated that he believed he became more involved in visits after a hearing on March 25, 2021, where he was court ordered to attend all visits in-person. (N.T. 08/13/21, pg. 45; N.T. 11/03/21, pgs. 81, 114, 169, 173, 175). Between

April and June 2021, Father attended eight virtual visits. (N.T. 11/03/21, pg. 169; N.T. 11/09/21, pg. 11). The current DHS Social Worker and the Foster Care Worker were not aware of why the visits were virtual rather than in-person, despite the court order. (N.T. 11/03/21, pgs. 169-170; N.T. 11/09/21, pgs. 11, 168). Father provided no reasonable explanation for violating the court order for in-person visits. Father chose to attend virtual visits only. In late July 2021, Father began attending visits in-person. (N.T. 11/03/21, pg. 169; N.T. 11/09/21, pg. 180). On July 8, 2021, Father had received the termination and goal change petitions that DHS had filed against him. The current DHS Social Worker shared the concern that Father did not visit with Child until she was fifteen-months old, and the second visit – apart from virtual visits – did not occur for another six months. (N.T. 11/03/21, pg. 170). Father has been appropriate and has not needed redirection during visits, but Father did not become consistent in his visitation until after TPR petitions were filed. (N.T. 11/03/21, pgs. 172-173). While virtual visits can be credited to Father, "realistically, a one-and-a-half-year-old is not going to stay engaged virtually." (N.T. 11/03/21, pg. 172). Father never graduated beyond supervised visits. (N.T. 11/09/21, pg. 48). Father only attended sixteen hours of in-person visits with Child throughout the two years of Child's life. (N.T. 11/03/21, pg. 195). Father does not do anything to provide for Child's needs outside of visitation. (N.T. 11/03/21, pgs. 109, 177; N.T. 11/09/21, pg. 49). During visits, Child generally recognizes Father individually but does not refer to him as her father and does not recognize him as her father. (N.T. 11/09/21, pgs. 86, 184). Child does not call Father anything, and Father only refers to Child by her name. (N.T. 08/13/21, pg. 61; N.T. 11/09/21, pgs. 183-184). Father testified that Child does not have any negative reaction when visits end. (N.T. 08/13/21, pg. 64).

Father also never asked the DHS Social Worker if Child had medical care, doctor appointments, dental needs, or other well-being issues. (N.T. 08/13/21, pg. 73; N.T. 11/03/21, pgs. 84, 163, 177). Father testified that he never asked because he assumed Child was up to date after Child had missed a visit due to a doctor's appointment. (N.T. 08/13/21, pg. 73). Father never asked anyone why Child had had the doctor's appointment that caused her to miss a visit. (N.T. 08/13/21, pgs. 73-74). Father never reached out to Child's doctor to see what appointments were scheduled or to inquire about her heath. (N.T. 11/03/21, pg. 45). Father never attended any of Child's medical appointments, or dental appointments. (N.T. 08/13/21, pg. 76; N.T. 11/03/21, pgs. 45, 47). Father alleged he never attended appointments "due to COVID." (N.T. 11/03/21, pgs. 45, 47). Father

assumed he could not access Child's medical information since she is not in his care, but Father also stated he never asked DHS about the issue or for medical updates. (N.T. 11/03/21, pgs. 45-47). Father claimed he did not ask for various information about Child, her heath, and other case information because he did not know he could ask. (N.T. 08/13/21, pg. 74; N.T. 11/03/21, pg. 46). However, Father is an experienced parent. He has four other children that he co-parents and visits on a weekly basis. (N.T. 08/13/21, pgs. 35, 37).

Child does not depend on Father as an essential caregiver, in large part because Father missed nearly the entire first year and a half of Child's life. (N.T. 11/03/21, pg. 109). Child has a very strong attachment to her Foster Parent. (N.T. 11/09/21, pg. 203). It would be "[q]uite traumatic" for Child to be removed from her current placement. (N.T. 11/03/21, pg. 182). Child's relationship with her Foster Parent is "very loving" and the Foster Parent "is very attentive to [Child's] needs, provides [Child] with everything that she needs." (N.T. 11/03/21, pgs. 198-199). Child's Foster Parent's life "revolves around" Child. (N.T. 11/03/21, pg. 199).

When asked why Father did not inquire about Child's well-being, or her needs and medical care, his response was often that he did not know he could do certain things, despite also testifying he knew he needed to ask questions to get information. Father repeatedly stated that because this was his "first time going through anything like this", he was unsure how to address the situation. (N.T. 08/13/21, pgs. 22, 47, 50). Father testified to asking a lot of questions during his first visit with Child to learn what he needed to do to gain custody of Child. (N.T. 08/13/21, pgs. 39, 42). He later testified that he knew he had to ask questions to learn information, but still did not ask questions. (N.T. 08/13/21, pg. 50). The current DHS Social Worker testified that no progress had been made toward alleviating the circumstances necessitating Child's placement. (N.T. 11/03/21, pgs. 181-182). Father was minimally compliant with his goals at the time the TPR and goal change petitions were filed. (N.T. 11/03/21, pg. 180-181; N.T. 11/09/21, pg. 27). Father had ample opportunity to put himself in a position to safely parent for twenty-five months. Father's whereabouts became unknown after he was informed of Child's possible placement after her birth. Father then did not re-avail himself for approximately fifteen months. After re-availing, Father continued to be inconsistent in his contact with DHS and in his visitation with Child. Father also did not follow court-order to attend visits in-person. At the time of the termination trial, Father still did not have

appropriate, safe, and stable housing. As a result of Father's noncompliance with his FSP and court-orders, the trial court found that termination of Father's parental rights was in the best interest of Child, for her physical, intellectual, moral, and emotional well-being. Father did not display the ability to protect, supervise, and maintain Child's safety. Father has shown a passive interest in fulfilling his parental duties towards this Child. Father is unable or unwilling to remedy the conditions which led to Child's placement and termination best serves Child's needs and welfare. Child needs permanency, which Father cannot provide. DHS made many attempts to locate Father and assist him in engaging in supervised visits. Because the trial court made this termination on the basis of clear and convincing evidence, termination under 23 Pa.C.S.A. §2511(a)(5) was proper.

The trial court also terminated Father's parental rights under 23 Pa.C.S.A. §2511(a)(8), which permits termination when:

> The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

This section does not require the court to evaluate a parent's willingness or ability to remedy the conditions which initially caused placement or the availability or efficacy of DHS services offered to the parent, only the present state of the conditions. *In re: Adoption of K.J.*, 936 A.2d 1128, 1133 (Pa. Super. 2007). The party seeking termination must prove by clear and convincing evidence that the termination is in the best interest of the child. The best interest of the child is determined after consideration of the needs and welfare of the child such as love, comfort, security, and stability. *In re Bowman*, 647 A.2d 217, 219 (Pa. Super. 1994). See also *In re Adoption of T.T.B.*, 835 A.2d 387, 397 (Pa. Super. 2003).

Child has been in care since October 2019, approximately twenty-two months at the start of the termination trial. (N.T. 08/13/21, pg. 10). By the time the trial concluded and a decision was rendered, Child had been in continuous DHS care for approximately twenty-five months. After speaking to the original DHS Social Worker at the hospital the day Child was born and, on the phone shortly thereafter, Father had no contact with DHS again until January 2021. (N.T. 11/03/21,

pgs. 79, 115). During this period of absence, DHS conducted a PLS on Father, called Father, sent emails, and sent letters to Father. Father's whereabouts were unknown for a period of approximately fifteen-months. Father's FSP objectives were developed at the start of the case in November 2019, not in January 2021 when he re-availed to DHS. (N.T. 11/03/21, pg. 116). Father's FSP objectives included: housing, employment, supervised visits, parenting classes, provide proof of income, and comply with an assessment for drug and alcohol and mental health concerns. (N.T. 11/03/21, pg. 81). Father was aware of his FSP objectives. The current DHS Social Worker spoke to Father when she took over the case in April 2021, and discussed his FSP with him. (N.T. 08/13/21, pg. 72; N.T. 11/03/21, pgs. 162-163). Father also testified that the original DHS Social Worker reviewed the plan and Father's goals with him when he re-availed in January 2021. (N.T. 11/03/21, pgs. 53, 127-128). Upon re-availing to DHS, Father continued to have inconsistent contact with DHS. When the current DHS Social Worker was assigned in April 2021, she attempted to reach out to Father in multiple formats and on multiple occasions, but was not able to contact Father until late July 2021. (N.T. 11/03/21, pg. 165; N.T. 11/09/21, pg. 25). The current Social Worker attempted to reach out to Father in April 2021, via the email Father provided on the record and no one responded, so she assumed it was a wrong email, but then Father responded via that same email in August 2021. (N.T. 11/09/21, pg. 42).

Father had stable employment and worked two jobs – one full-time and one part-time job, which had been full-time but reduced to part-time so Father could attend ARC. (N.T. 11/03/21, pg. 17). Father did not have a plan for Child's care while he is at work and had not identified a daycare. (N.T. 11/03/21, pgs. 44-45, 177). DHS had documentation that Father completed housing, finance, and parenting programs at ARC. (N.T. 11/03/21, pg. 176; see also Father's Exhibits 1-3). The current Social Worker reached out to CBH, who reported that Father had no history of mental illness. (N.T. 11/09/21, pgs. 18-19). Father was also not referred to CEU. (N.T. 11/09/21, pg. 21). Father testified his housing was unstable for approximately a year after his separation with his prior paramour. (N.T. 08/13/21, pg. 18). His housing remained unstable as of the termination trial, and the DHS Social Worker could not state with certainty where Father actually lived, or whether his housing was stable, safe, and appropriate. (N.T. 11/09/21, pgs. 46-47). Additionally, Father's paystubs presented further confusion regarding Father's address as each job listed a different address. (N.T. 11/03/21, pg. 178). Father did not clarify the address situation with DHS when

asked. (N.T. 11/09/21, pg. 46). The original DHS Social Worker testified that they had originally scheduled a home assessment in March of 2021, but Father claimed he was moving in June 2021 and wanted to reschedule the assessment for after he moved. (N.T. 11/03/21, pgs. 82, 128). The home assessment was never rescheduled, and Father never requested or availed himself for a housing assessment of any address. (N.T. 11/09/21, pg. 46). Father testified to being "pretty much absent for about a year" after Child's birth. (N.T. 08/13/21, pg. 24). Father did not see Child again after her birth in October 2019, until January 2021, approximately fifteen-months. (N.T. 08/13/21, pg. 26). During this period of absence, from October 2019 until January 2021, Father did not provide child support, gifts, or any other support, and did not have contact with Child, Mother, or anyone else involved in the case. (N.T. 08/13/21, pgs. 25, 33-34; N.T. 11/03/21, pg. 80). However, during that same period of absence from Child, Father made frequent contact with his prior paramour to check-in on his four other children and saw them "probably twice a week" or "every other week." (N.T. 08/13/21, pgs. 35, 37). Father testified he currently saw his four other children "[a]t least three to four times a week." (N.T. 11/03/21, pgs. 32-33). When asked why Father was able to overcome various barriers to see his other four children, Father stated "I don't really have an answer for that." (N.T. 08/13/21, pg. 53). After re-availing, Father was eligible for weekly visits. (N.T. 11/03/21, pg. 85). Father attended an initial visit with Child in January 2021 and then only had one virtual visit with Child until April 2021. (N.T. 08/13/21, pgs. 44-45; N.T. 11/03/21, pgs. 83-85). DHS had no reason from Father as to why no other visits occurred. (N.T. 11/09/21, pgs. 28-29, 42-43). In March 2021, Father was court ordered to attend all visits in-person. (N.T. 08/13/21, pg. 45; N.T. 11/03/21, pgs. 169, 173, 175). Between April and June 2021, Father attended eight virtual visits. (N.T. 11/03/21, pg. 169; N.T. 11/09/21, pg. 11). The current DHS Social Worker and the Foster Care Worker were not aware of why the visits were virtual rather than in-person, despite the court order. (N.T. 11/03/21, pgs. 169-170; N.T. 11/09/21, pgs. 11, 168). Father provided no reasonable explanation for violating the court order for in-person visits. Father chose to attend virtual visits only. In late July 2021, Father began attending in-person visits, after the TPR and goal change petitions were filed. (N.T. 11/03/21, pg. 169; N.T. 11/09/21, pg. 180). Father's initial lack of visitation with Child was a concern to the DHS Social Worker, given that Father had already missed over a year of Child's life already and she did not know him as her Father. (N.T. 11/03/21, pg. 86). Father never graduated beyond supervised visits. (N.T. 11/09/21,

pg. 48). Father only attended sixteen hours of in-person visits with Child throughout the two years Child has been alive. (N.T. 11/03/21, pg. 195). Father does not do anything to provide for Child's needs outside of visitation. (N.T. 11/03/21, pgs. 109, 177; N.T. 11/09/21, pg. 49). Father had ample opportunity to put himself in a position to safely provide for Child, but the conditions necessitating Child's removal and placement have persisted. Child needs permanency and safety, which Father is unable to provide. As a result of Father's noncompliance with his FSP objectives and the continued existence of the conditions that led to Child's placement, the trial court found that termination of Father's parental rights was in the best interest of Child, for her physical, intellectual, moral, and emotional well-being. Because the record contains clear and convincing evidence and the trial court made these terminations on the basis of such evidence, termination under 23 Pa.C.S.A. §2511(a)(8) was proper.

After a finding of any grounds for termination under Section (a), the court must, under 23 Pa.C.S.A. §2511(b), also consider what - if any - bond exists between parent and child. _In re Involuntary Termination of C.W.S.M. and K.A.L.M._, 839 A.2d 410, 415 (Pa. Super. 2003). The trial court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship". _In re Adoption of T.B.B._ 835 A.2d 387, 397 (Pa. Super. 2003). In assessing the parental bond, the trial court is permitted to rely upon the observations and evaluations of social workers. _In re K.Z.S._, 946 A.2d 753, 762-763 (Pa. Super. 2008). The trial court must determine that the bond between a parent and a child cannot be in only one direction. There must be a bilateral relationship that roots from a parent's willingness to learn appropriate parenting skills and ability to provide stability to the child. _In re K.K.R.-S._, 958 A.2d 529, 534 (Pa. Super. 2008). Additionally, a bond is not just a positive relationship between a child and a parent. Being a parent means assuming responsibility so that a real bond develops, not just a casual relationship. Children have the ability to know, love, and sometimes have an enjoyable time with a parent that have little to do with their upbringing. _In re J.L.C._, 837 A.2d 1247, 1249 (Pa. Super. 2003). In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis depends on the circumstances of the particular case. _Id_. However under 23 Pa.C.S.A. §2511(b), the rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, or medical care, if found to be beyond the control of the parent. The

trial court should consider the best interest of the child as it exists presently, rather than the facts at the time of the original petition.

Father was absent from Child's life from her birth in October 2019 until January 2021, approximately fifteen-months. During this period, Father did not provide child support, gifts, or any other support, and did not have contact with Child, Mother, or anyone else involved in the case. (N.T. 08/13/21, pgs. 25, 33-34; N.T. 11/03/21, pg. 80). However, during that same period of absence from Child, Father made frequent contact with his prior paramour to check-in on his four other children and saw them "probably twice a week" or "every other week." (N.T. 08/13/21, pgs. 35, 37). Father testified he currently saw his four other children "[a]t least three to four times a week." (N.T. 11/03/21, pgs. 32-33). When asked why Father was able to overcome various barriers to see his other four children but not Child, Father stated "I don't really have an answer for that." (N.T. 08/13/21, pg. 53). Father expressed doubt as to whether Child was his biological child. (N.T. 08/13/21, pgs. 32, 40-41, 51-52). However, despite the claimed doubts, Father never requested a paternity test from the court. (N.T. 08/13/21, pg. 51). As of the start of the termination trial, Father testified he still doubted his paternity of Child. (N.T. 08/13/21, pgs. 40-41, 52). Father also testified that at the March 2021 hearing, he did not question Child's paternity, but also did not want "a paternity test or the results of a paternity test determine [sic] whether or not [he] can raise a child or not, or [] be a part of a child's life." (N.T. 08/13/21, pg. 51). At the second trial date, Father testified he did not question his paternity to Child. (N.T. 11/03/21, pg. 18). Father testified he had not taken any steps to file a claim of paternity with the Department of State. (N.T. 11/03/21, pgs. 18-19).

After Father re-availed himself in January 2021, the original DHS Social Worker provided Father with the necessary information to schedule visits with Child and instructed Father to reach out to schedule an initial visit. (N.T. 11/03/21, pgs. 81, 114). The foster care worker reported that she had to reach out to Father to schedule his initial visit with Child. (N.T. 11/03/21, pgs. 81, 114). After not seeing Child since her birth in October 2019, Father had an initial visit with Child on January 21, 2021. (N.T. 08/13/21, pgs. 38-39; N.T. 11/03/21, pgs. 22, 114; 11/09/21, pg. 9). This first visit occurred nearly sixteen-months after Child's birth on October 5, 2019. It was unclear whether this visit was in-person or virtual as witnesses testified to both. During the visit, the foster

care worker explained to Father how to schedule further visitation. (N.T. 11/03/21, pg. 114). Despite having this information from multiple sources, Father did not request another visit at the time of the initial visit. (N.T. 11/03/21, pgs. 114-115). Between January 2021 and April 2021, Father only had one virtual visit with Child. (N.T. 08/13/21, pgs. 44-45; N.T. 11/03/21, pgs. 83-85). Father was eligible for weekly supervised visits. (N.T. 11/03/21, pg. 85). DHS had no reason from Father as to why no other visits occurred. (N.T. 11/09/21, pgs. 28-29, 42-43). Father claimed he was unable to visit due to work schedule conflicts, and stated he had verbally informed DHS of his schedule and also that he did not inform DHS of his schedule at all. (N.T. 08/13/21, pgs. 46-47). The DHS Social Worker was not made aware of any reason the agency could not facilitate visits, nor did Father ever express that he had any barriers to attending. (N.T. 11/03/21, pgs. 85-86, 131-132). Father claimed the DHS Social Worker never told him that she needed documentation of Father's work schedule. (N.T. 08/13/21, pg. 46). Father also claimed he did not know he needed to reach out to schedule visits and stated that he believed he became more involved in visits after a hearing on March 25, 2021, where he was court ordered to attend all visits in-person. (N.T. 08/13/21, pg. 45; N.T. 11/03/21, pgs. 169, 173, 175). Visits were virtual in the beginning of Father's involvement due to pandemic restrictions. (N.T. 08/13/21, pg. 65). Father did not ask about in-person visitation; a DHS worker had to address the topic with Father. (N.T. 08/13/21, pgs. 65-66). Father also testified he was unaware he could ask for more frequent or longer visits. (N.T. 08/13/21, pg. 73). Between April and June 2021, Father attended eight virtual visits. (N.T. 11/03/21, pg. 169; N.T. 11/09/21, pg. 11). The current DHS Social Worker and the Foster Care Worker were not aware of why the visits were virtual rather than in-person, despite the court order. (N.T. 11/03/21, pgs. 169-170; N.T. 11/09/21, pgs. 11, 168). Father provided no reasonable explanation as to why he continued with virtual visits, in violation of court order. In early July 2021, the TPR and goal change petitions were filed against Father. Since July 22, 2021, Father attended weekly supervised visits in-person. (N.T. 11/03/21, pg. 169; N.T. 11/09/21, pg. 180). Father's initial lack of visitation with Child was a concern to the DHS Social Worker, given that Father had already missed over a year of Child's life already and she did not know him as her Father. (N.T. 11/03/21, pg. 86). The current DHS Social Worker shared the concern that Father did not visit with Child until she was fifteen-months old, and the second visit – apart from virtual visits – did not occur for another six months. (N.T. 11/03/21, pg. 170). Father has been appropriate

and has not needed redirection during visits, but Father did not become consistent in his visitation until after TPR petitions were filed. (N.T. 11/03/21, pgs. 172-173). Additionally, while virtual visits can be credited to Father, "realistically, a one-and-a-half-year-old is not going to stay engaged virtually." (N.T. 11/03/21, pg. 172). Father never graduated beyond supervised visits. (N.T. 11/09/21, pg. 48). Father only attended sixteen hours of in-person visits with Child throughout the two years of Child's life. (N.T. 11/03/21, pg. 195). During visits, Child generally recognizes Father but does not refer to him as her father and does not recognize him as her father. (N.T. 11/09/21, pgs. 86, 184). Child does not call Father anything, and Father only refers to Child by her name. (N.T. 08/13/21, pg. 61; N.T. 11/09/21, pgs. 183-184). Father testified that Child does not have any negative reaction when visits end. (N.T. 08/13/21, pg. 64). Child enjoys her visits with Father since Father brings items to play with and the visitation room had many toys. (N.T. 11/09/21, pgs. 181-183). Child is a happy child and always has a good disposition. (N.T. 11/09/21, pgs. 199-200).

According to the Foster Care Worker, the bond between Father and Child is still developing and growing. (N.T. 11/09/21, pg. 201). At the same time, Child still had a "very strong attachment to her foster parent." (N.T. 11/09/21, pg. 203). On direct examination, the Foster Care Worker testified that Child would be harmed if the bond with Father was severed. (N.T. 11/09/21, pgs. 191-192). However, the Foster Care Worker defines "bond" as the "[Child] making that connection with her [F]ather...She looks forward to spending time with him." (N.T. 11/09/21, pg. 191). The Foster Care Worker's definition of "bond", as he described it, it not the accepted legal concept under our case law. The concept the Foster Care Worker described is a relationship that is developing because Father, since he was made aware that TPR and goal change petitions were filed against him, has been more consistent at showing up to his supervised in-person visits. Just because the Child enjoys a positive relationship with Father, it does not mean a real bond has developed. Children have the ability to show love and sometimes have an enjoyable time with a parent that has little to do with their upbringing. Furthermore, the Foster Care Worker was unable to assess whether Child would be irreparably harmed if removed from the Foster Parent's home. (N.T. 11/09/21, pgs. 208-209, 212-213). The Foster Care Worker's testimony as to assessment of irreparable harm just cannot be believed because he equates "the [F]oster [P]arent [having] some mental issues that affects severing a relationship and [] care for this [C]hild." (N.T. 11/09/21, pg.

213). Upon further inquiry, the Foster Care worker testified that the two incidents that occurred with Foster Parent and Mother at two prior visits is enough to show irreparable harm to Child if Father's relationship is severed with the Child. (N.T. 11/09/21, pgs. 237-242). The record does not contain any mental health concerns as to the Foster Parent. Foster Care Worker's testimony as to irreparable harm is just not credible.

Child does not depend on Father as an essential caregiver, in large part because Father missed nearly the entire first year and a half of Child's life. (N.T. 11/03/21, pg. 109). Child has a very strong attachment to her Foster Parent. (N.T. 11/09/21, pg. 203). It would be "[q]uite traumatic" for Child to be removed from her current placement. (N.T. 11/03/21, pg. 182). Child's relationship with her Foster Parent is "very loving" and the Foster Parent "is very attentive to [Child's] needs, provides [Child] with everything that she needs." (N.T. 11/03/21, pgs. 198-199). Child's Foster Parent's life "revolves around" Child. (N.T. 11/03/21, pg. 199). Father does not do anything to provide for Child's needs outside of visitation. (N.T. 11/03/21, pgs. 109, 177; N.T. 11/09/21, pg. 49). Child does not have a parent-child bond with Father. (N.T. 11/03/21, pg. 124). No irreparable harm would be done if whatever relationship Child may have with Father was severed. (N.T. 11/03/21, pgs. 124, 182, 196). Child has only known her Foster Parent as a parental figure for her entire life and has a parental bond with her Foster Parent. (N.T. 11/03/21, pgs. 171, 182, 198). Father stated he is comfortable with the care Child is currently receiving and had not asked DHS how Child's needs are met while in placement. (N.T. 11/03/21, pgs. 46-47).

Child has been in placement with her Foster Parent for "pretty much her entire life", since she was an infant of less than one month old. (N.T. 11/03/21, pgs. 124-125; N.T. 11/09/21, pgs. 103, 106). Child's Foster Parent is the one who takes Child to appointments, meets her needs, and provides Child "with everything she needed." (N.T. 11/03/21, pgs. 108-109, 123). Father does not inquire about Child's care and well-being, and assumed he was not able to obtain that information since Child is not in his custody. (N.T. 08/13/21, pg. 73; N.T. 11/03/21, pgs. 45-47, 84, 163, 177). However, Father is an experienced parent with four other older children he regularly visits and co-parents. Child does not have a parent-child bond with Father, in large part due to his absence from her life for the fifteen months and then inconsistent visitation after re-availing. Child cannot be safely returned to Father due to his lack of appropriate housing and inability to care for Child.

(N.T. 11/03/21, pgs. 182-183). Finding stable and safe housing is not beyond the control of Father. Father has two jobs and needs to have an appropriate lease. Throughout this case and Father's period of absence from Child's life, Father maintained contact with his other four children.

Child is bonded with her Foster Parent, and has a parent-child bond with the Foster Parent. (N.T. 11/03/21, pgs. 109, 124; N.T. 11/09/21, pgs. 87-88). At visits, Child recognizes Father but appears bonded with her Foster Parent. (N.T. 11/09/21, pgs. 79-80). The original DHS Social Worker observed Child and her Foster Parent at least monthly. (N.T. 11/03/21, pg. 109). During visitaiton, Child goes to her Foster Parent and would not pay any attention to the DHS Social Worker. (N.T. 11/03/21, pgs. 109-110, 124). If the DHS Social Worker tried to re-direct Child, Child would go to her Foster Parent instead. (N.T. 11/03/21, pg. 110). Child's relationship with her Foster Parent is "[e]xtremely important" as the Foster Parent is who meets all Child's needs and ensures her safety. (N.T. 11/03/21, pg. 110). It would be detrimental to remove Child from her current placement. (N.T. 11/03/21, pg. 110). Child has "become family" and is very involved in her Foster Parent's family. (N.T. 11/03/21, pgs. 110-111). The DHS Social Worker believed adoption was the most appropriate goal for Child. (N.T. 11/03/21, pg. 111).

Child may recognize Father individually, but there is no apparent, healthy, or beneficial and necessary bond to preserve. It is in Child's best interest to terminate Father's parental rights and be freed for adoption. Due to Father's noncompliance with his FSP objectives and lack of consistent participation in supervised visits, Father has not created a healthy and beneficial parental bond with Child. The record established by clear and convincing evidence that termination would not sever an existing and beneficial relationship between Father and Child. The court takes judicial notice that the Child is a baby; therefore, she is incompetent to know the difference between reunification and adoption, and provide her wishes to the court. Consequently, the Child Advocate had no conflict representing both the Child's best interests and legal interests for TPR purposes. There was no need for a separate Guardian Ad Litem to be appointed as TPR legal counsel. (N.T. 08/13/21, pg. 11). The trial court's termination of Father's parental rights to Child under 23 Pa.C.S.A. §2511(b) was proper and there was no error of law.

Father also asserts that the court erred in changing Child's permanency goal from reunification to adoption. Pursuant to 42 Pa.C.S.A. §6351, when considering a petition to change a dependent

child's goal, the trial court must consider, *inter alia*:

> (1) the continuing necessity for and appropriate of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal of the child; (5) a likely date by which the goal might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty two months.

*In re A.B.*, 19 A.3d 1084, 1088-1089 (Pa. Super. 2011). In a change of goal proceeding, the child's best interest must be the focus of the trial court's determination. The child's safety and health are paramount considerations. *In re A.H.*, 763 A.2d 873, 877 (Pa. Super. 2000). Pennsylvania's Juvenile Act recognizes family preservation as one of its primary purposes. *In the Interest Of R.P. a Minor*, 957 A.2d 1205, 1220 (Pa. Super. 2008). As a result, welfare agencies must make efforts to reunify the biological parents with their child. Nonetheless, if those efforts fail, the agency must redirect its efforts toward placing the child in an adoptive home. Agencies are not required to provide services indefinitely when a parent is unwilling or unable to apply the instructions received. *In re R.T.*, 778 A.2d 670, 681 (Pa. Super. 2001). A child's life cannot be put on hold in the hope that parent will someday summon the ability to handle and assume the responsibilities of being a parent. *In re A.B.*, 19 A.3d at 1089. The trial court should consider the best interest of the child as it exists presently, rather than the facts at the time of the original petition.

Father's FSP objectives included: housing, employment, supervised visits, parenting classes, provide proof of income, and comply with an assessment for drug and alcohol and mental health concerns. (N.T. 11/03/21, pg. 81). Father's FSP objectives were developed at the start of the case in November 2019, not in January 2021, when he re-availed to DHS. (N.T. 11/03/21, pg. 116). Father was aware of his FSP objectives. The current DHS Social Worker spoke to Father when she took over the case in April 2021, and discussed his FSP with him. (N.T. 08/13/21, pg. 72; N.T. 11/03/21, pgs. 162-163). Father also testified that the original DHS Social Worker reviewed the plan and Father's goals with him when he re-availed in January 2021. (N.T. 11/03/21, pgs. 53, 127-128).

Father had inconsistent contact with the DHS Social Worker. Father re-availed to DHS in January 2021, and testified to calling DHS on January 1, 2021. (N.T. 08/13/21, pg. 27). The original Social Worker could not recall any contact with Father between October 8, 2019, and January 2021. (N.T. 11/03/21, pg. 79). DHS conducted a PLS on Father and once they obtained an address in May 2020, DHS began sending letters to Father with information about his FSP and FSP meetings. (N.T. 11/03/21, pgs. 79-80, 115, 125-126). These letters also included the DHS Social Worker's contact information. (N.T. 11/03/21, pg. 80). The court also mailed Father court orders. (N.T. 11/03/21, pg. 80). The DHS Social Worker attempted to call Father as well. (N.T. 11/03/21, pg. 126). Despite attempts, there was no contact with Father until January 2021. (N.T. 11/03/21, pg. 115). Upon re-availing to DHS, Father continued to have inconsistent contact with the DHS Social Worker. Father could not say how frequently he reached out to DHS, but indicated it could be monthly or every several months. (N.T. 11/03/21, pgs. 34-35). When the current DHS Social Worker was assigned in April 2021, she attempted to reach out to Father in multiple formats and on multiple occasions, but was not able to contact Father until late July 2021. (N.T. 11/03/21, pg. 165; N.T. 11/09/21, pg. 25). The current DHS Social Worker attempted to reach out to Father, in April 2021, via the email Father provided on the record and no one responded, so she assumed it was a wrong email, but then Father responded via that same email in August 2021. (N.T. 11/09/21, pg. 42).

Father has two jobs – one full-time and one part-time job, which had been full-time but reduced to part-time so Father could attend ARC. (N.T. 11/03/21, pg. 17). DHS had documentation that Father completed housing, finance, and parenting programs at ARC. (N.T. 11/03/21, pg. 176; see also Father's Exhibits 1-3). Father stated he works from approximately 7:00 a.m. until 5:00 or 6:00 p.m. Monday through Friday, and then works 7:00 a.m. until 3:00 or 4:00 p.m. on Saturdays and Sundays. (N.T. 11/03/21, pgs. 48-49). Father testified that he provided paystubs for both jobs to the DHS Social Worker, and while DHS did have some paystubs, they created confusion regarding Father's address and Father did not clarify his address when asked. (N.T. 08/13/21, pg. 77; N.T. 11/03/21, pgs. 17, 178; N.T. 11/09/21, pg. 46). Father indicated that should Child be returned to his care, he did not believe that his work schedule would be a barrier. (N.T. 11/03/21, pgs. 40-41). He stated that "adjustments can and will be made." (N.T. 11/03/21, pg. 41). Father indicated he has a younger sibling in Texas who would be "more than willing to help [Father] out." (N.T.

11/03/21, pg. 42). Father had previously indicated to the DHS Social Worker that he had no family or friends to assist in caring for Child. (N.T. 11/03/21, pg. 78). The DHS Social Worker had not heard of any family supports until the second termination trial date. (N.T. 11/03/21, pg. 177). Father never reached out to DHS to share who his family supports would be or ask for background checks and clearances. (N.T. 11/03/21, pgs. 43-44, 82). Father did not have a plan for Child's care while he is at work and had not identified a daycare. (N.T. 11/03/21, pgs. 44-45, 177). The current DHS Social Worker reached out to CBH, who reported that Father had no history of mental illness. (N.T. 11/09/21, pgs. 18-19). Father was also not referred to CEU. (N.T. 11/09/21, pg. 21).

Father also testified that his home was not housing for reunification due to his name not being on the lease. (N.T. 11/03/21, pg. 31). As of the second trial date, Father had not begun the process of adding his name to the lease because he "didn't see a reason for it." (N.T. 11/03/21, pg. 32). Father stated he was looking for different housing, via avenues such as Zillow and Hotpads.com, as well through a realtor. (N.T. 11/03/21, pg. 55). Father testified to providing DHS with his current address in January 2021. (N.T. 11/03/21, pg. 30). The original DHS Social Worker testified that they had originally scheduled a home assessment in March of 2021, but Father claimed he was moving in June 2021 and wanted to reschedule the assessment for after he moved. (N.T. 11/03/21, pgs. 82, 128). The home assessment was never rescheduled, and as far as DHS believed and as Father testified, he remained at the same address since January 2021. (N.T. 11/03/21, pgs. 30, 82, 128). Father never requested or availed himself for a housing assessment of any address. (N.T. 11/09/21, pg. 46). The current DHS Social Worker testified that in July 2021, Father had stated he "was hoping to obtain housing by August" 2021. (N.T. 11/03/21, pg. 165). On July 20, 2021, Father reported an address on Joyce Street to the DHS Social Worker, but email correspondence indicated he had left that address in December 2020, and then on August 2, 2021, he reported an address on Spark Street. (N.T. 11/03/21, pgs. 166-167). At an FPS meeting on September 29, 2021, Father still did not have appropriate, stable, and safe housing. (N.T. 11/03/21, pg. 178; N.T. 11/09/21, pg. 27). As of the final TPR trial date, the DHS Social Worker could not state with certainty where Father actually lived or whether his housing was safe and appropriate. (N.T. 11/03/21, pg. 178; N.T. 11/09/21, pgs. 46-47). Housing remained an outstanding objective for Father.

Father never graduated beyond supervised visits. (N.T. 11/09/21, pg. 48). Father only attended sixteen hours of in-person visits with Child throughout the two years of Child's life. (N.T. 11/03/21, pg. 195). After Child's birth in early October 2019, Father had his first visit with her in late January 2021, approximately sixteen-months after her birth. (N.T. 08/13/21, pgs. 38-39; N.T. 11/03/21, pgs. 22, 114; 11/09/21, pg. 9). Between January 2021 and April 2021, Father only had one virtual visit with Child. (N.T. 08/13/21, pgs. 44-45; N.T. 11/03/21, pgs. 83-85). Father was eligible for weekly supervised visits. (N.T. 11/03/21, pg. 85). DHS had no reason from Father as to why no other visits occurred. (N.T. 11/09/21, pgs. 28-29, 42-43). In March 2021, Father was court-ordered to attend visits in-person. (N.T. 08/13/21, pg. 45; N.T. 11/03/21, pgs. 169, 173, 175). Between April and June 2021, Father attended eight virtual visits. (N.T. 11/03/21, pg. 169; N.T. 11/09/21, pg. 11). The current DHS Social Worker and the Foster Care Worker were not aware of why the visits were virtual rather than in-person, despite the court order. (N.T. 11/03/21, pgs. 169-170; N.T. 11/09/21, pgs. 11, 168). Father provided no reasonable explanation for violating the court order for in-person visitation. Father chose to do virtual visits only. Father began attending in-person visits in late July 2021, after the TPR and goal change petitions were filed on July 8, 2021. Father's initial lack of visitation with Child was a concern to the DHS Social Worker, given that Father had already missed over a year of Child's life already and she did not know him as her Father. (N.T. 11/03/21, pg. 86). The current DHS Social Worker shared the concern that Father did not visit with Child until she was fifteen-months old, and the second visit – apart from virtual visits – did not occur for another six months. (N.T. 11/03/21, pg. 170). Father does not do anything to provide for Child's needs outside of visitation. (N.T. 11/03/21, pgs. 109, 177; N.T. 11/09/21, pg. 49). Child has been with her Foster Parent since she was less than one month old. (N.T. 11/03/21, pgs. 124-125). Child is bonded with her Foster Parent and has a parent-child bond with the Foster Parent. (N.T. 11/03/21, pgs. 109, 124; N.T. 11/09/21, pgs. 87-88). Child's relationship with her Foster Parent is "[e]xtremely important" as the Foster Parent is who meets all Child's needs and ensures her safety. (N.T. 11/03/21, pg. 110). It would be detrimental to remove Child from her current placement. (N.T. 11/03/21, pg. 110). Child has "become family" and is very involved in her Foster Parent's family. (N.T. 11/03/21, pgs. 110-111). Child has a very strong attachment to her Foster Parent. (N.T. 11/09/21, pg. 203). The DHS Social Worker believed adoption was the most appropriate goal for Child. (N.T. 11/03/21, pg. 111). Child has been in

placement for her entire life, since shortly after her birth in October 2019. Child has never been in Father's care and Father was absent for the majority of Child's life and then inconsistent in visitation once he re-availed himself. Child is a happy child. (N.T. 11/09/21, pgs. 199-200). Child enjoys her visits with Father since Father brings items to play with and the visitation room has many toys. (N.T. 11/09/21, pgs. 181-183). The Foster Care Worker testified that the bond between Father and Child is still developing and growing. (N.T. 11/09/21, pg. 201). As such, there is no parental, healthy, beneficial necessary bond between Child and Father. Child needs permanency and safety, which Father cannot provide. There is no reasonable timeline within which Father could establish the ability to care for Child. Father has made no efforts to create a safe environment for Child. After twenty-five months, Father has made no progress toward alleviating the conditions necessitating Child's removal from his care. Child cannot be safely reunified with Father. Child's most appropriate permanency goal is adoption, and it is in Child's best interest to be freed for adoption. The trial court did not error abuse its discretion when it changed Child's goal to adoption.

**Conclusion:**

For the aforementioned reasons, the trial court found that DHS met its statutory burden by clear and convincing evidence regarding termination of Father's parental rights to Child pursuant to 23 Pa.C.S.A. §2511(a)(1), (2), (5), (8) and (b); and change Child's goal from reunification to adoption pursuant to 42 Pa.C.S.A. §6351. The trial court's termination of Father's parental rights and changing of Child's goal was proper and should be affirmed.

By the court,

Joseph Fernandes J.

# IN THE COURT OF COMMON PLEAS
# FOR THE COUNTY OF PHILADELPHIA
# FAMILY COURT DIVISION

| | | |
|---|---|---|
| In the Interest of A.Y.M., a Minor<br>a/k/a A.M. | : | CP-51-DP-0001591-2019<br>CP-51-AP-0000364-2021 |
| | : | |
| | : | FID:   51-FN-376660-2009 |
| | : | |
| APPEAL OF: K.I., Father | : | 2509 EDA 2021<br>2510 EDA 2021 |
| | : | |

## CERTIFICATE OF SERVICE

I hereby certify that this court is serving a copy of this duly executed Opinion upon all parties or their counsel on <u>February 24, 2022</u>. The names and addresses of all persons served are as follows:

A.Bennette Harrison, Esq.
City of Philadelphia Law Department
1515 Arch Street, 16th Floor
Philadelphia, Pennsylvania 19102
a.bennette.harrison@phila.gov

Beth Kahn, Esq.
Defender Association
1441 Sansom Street, 9th Floor
Philadelphia, Pennsylvania 19102
bkahn@philadefender.org

Lisa Visco, Esq.
206 N 22nd Street, Unit B
Philadelphia, Pennsylvania 19103
viscolaw@gmail.com

John Capaldi, Esq.
1812 Fox Chase Road
Philadelphia, Pennsylvania 19152
johncapaldi@hotmail.com

BY: _____

*Sabine A. Glocker, M.S., Esq.*
Law Clerk to the Hon. Joseph L. Fernandes
First Judicial District of Pennsylvania
1501 Arch St., Room 1431
Philadelphia, Pa. 19102
T: (215) 686-2660 | F: (215) 686-4224
sabine.glocker@courts.phila.gov